CHAMPION PARTS REBUILDERS, INC., NORTHEAST DIVISION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 82–3145.

United States Court of Appeals, Third Circuit.

Argued Dec. 13, 1982.

Original Opinion May 9, 1983.

Opinion Vacated and Panel Rehearing Granted Aug. 10, 1983.

Submitted Under Third Circuit Rule 12(6) Sept. 6, 1983.

Decided Sept. 21, 1983.

Walter O. Lambeth, Jr. (argued), Brent L. Wilson, Elarbee, Clark & Paul, Atlanta, Ga., for petitioner.

Daniel Pollitt (argued), Carol A. De Deo, Attys., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondents.

Before HUNTER, GARTH, Circuit Judges, WEBER,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Champion Parts Rebuilders, Inc. ("the Company") has petitioned for review of an order of the National Labor Relations Board ("the Board").[1] The Board has filed a cross-application for enforcement of its order. We have jurisdiction pursuant to sections 10(e) and 10(f) of the National Labor Relations Act ("the Act"). 29 U.S.C. §§ 160(e), 160(f) (1976). For the reasons stated herein we will grant enforcement of part and will deny enforcement of part of the Board's order.[2]

### I

The Company engages in the manufacture, repair, and wholesale distribution of automobile parts. This proceeding involves three of the Company's plants in its Northeast Division, two located in Mill Hall, Pennsylvania, and one located in Lock Haven, Pennsylvania. The manager of the Northeast Division is James Cameron. Reporting to him are plant managers James Cottel, Bruce Williams, and Ron Rupert. Cameron reports to the vice-president of manufacturing, Donald Savini, and the Company's president, Charles Schwartz, both of whom are located at the Company's main office in Chicago.

The Company employs approximately 325 employees in its Northeast Division. Those employees have been represented by the International Brotherhood of Electrical Workers, Local 1592, AFL–CIO ("the Union") for the past 30 years. In April of 1977, the Union leadership was replaced with new union officers including Michael Smith, president, and Henry Longo, vice-president. As a result of that change in leadership, the relationship between the Company and the Union became considerably more hostile. For example, between 1969 and April of 1977, there were 53 grievances and no unfair labor practice charges filed against the Company. From April of 1977 until July of 1980, however, 210 grievances and 18 unfair labor practice charges were filed. 260 N.L.R.B. at 736.

### II

This petition for review and the cross-application for enforcement involve the Board's findings that the following actions were unfair labor practices under the Act: (A) the Company's discharge of employee Leona Peters, (B) the Company's issuance of warning notices to employees Henry Longo and Bertha Martin, (C) the Company's issuance of warning notices to chief shop steward Barry Hill, (D) incidents involving Union use of Company telephones and photocopying machines, and (E) the Company's unilateral change in its procedure for allowing employees to copy doctor's excuses on Company photocopying machines. We will consider each alleged unfair labor practice charge in turn. We must accept the Board's findings of fact if they are supported by substantial evidence on the record taken as a whole, *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), but we have plenary review as to questions of law, *see Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 182, 92 S.Ct. 383, 399, 30 L.Ed.2d 341 (1971).

### A. The Discharge of Peters

Leona Peters was hired by the Company in August of 1977. During her employment Peters filed five grievances and one unfair labor practice charge against the Company.

---

* Honorable Gerald Weber, of the United States District Court for the Western District of Pennsylvania, sitting by designation.

1. The Board's decision and order are published at 260 N.L.R.B. 731 (1982).

2. An original panel decision was filed in this case on May 9, 1983 and judgment was entered on June 9, 1983. On June 24, 1983, the Board moved for leave to file a petition for panel rehearing out of time. In its motion the Board asked that we reexamine our decision in light of the Supreme Court's opinion in *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). We granted the Board's motion on August 10, 1983.

Three of those grievances were directed against her supervisor Calvin Allen for using abusive language toward her, for harassing her, and for issuing a warning notice to her for excessive absenteeism. In the instant case Peters testified that Allen had made numerous derogatory comments concerning her Union activities. For example, Peters credibly testified that early in February of 1980, Allen asked her: "When are you going to wake up and quit filing so many grievances—and wake up to what the company can do for you, instead of being so much for the Union?" App. at 239. She testified that Allen "told me that I would end up getting fired if I didn't." *Id.* A week after Allen made his comments, Peters filed her third grievance, alleging harassment. 260 N.L.R.B. at 732.

On February 20, 21, and 22, 1980, Peters was ill and did not report to work. There are two Company rules regarding absence from work because of illness. One plant rule states that employees who are ill may be discharged if they fail to call in on two successive days of absence. An addendum to the plant rules also provides as follows:

> On the Employee's third day off work, he/she must call the Employee Service Clerk and request a Medical Leave of Absence .... Any employee not abiding by the above will be subject to disciplinary action, up to and including discharge.

App. at 119.

Peters did call in on February 20 and February 22 to report that she would be absent from work. She did not, however, secure a medical leave of absence on February 22 as the Company's rule requires.[3] When Peters returned to work on Monday, February 25, Allen told her that he thought she was terminated for failure to obtain a medical leave of absence and took her to Plant Superintendent Rupert's office. Rupert initially refused to take any action against Peters, stating to Allen, "she's all right Calvin, she called in." Later that morning, however, Rupert changed his mind and informed Peters that she was being terminated.

The Company maintained that it fired Peters because she violated the Company's written rule requiring employees to secure a medical leave of absence on their third day of absence from work. The General Counsel argued that the Company discharged Ms. Peters because of her Union activities in violation of sections 8(a)(1), 8(a)(3), and 8(a)(4).[4] After examining the evidence the ALJ concluded that the General Counsel had failed to prove by a preponderance of the evidence that Peters was discharged in violation of the Act.

▇ The Board reversed finding that the Company violated sections 8(a)(1) and 8(a)(3) of the Act.[5] Citing *Wright Line, a Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), the Board con-

---

**3.** The record discloses that Peters drove to the plant on February 22 on two occasions to secure a medical leave of absence and to pick up her paycheck, but was unsuccessful in locating the employee service clerk responsible for issuance of such leave. 260 N.L.R.B. at 732.

**4.** Section 8(a)(1) provides:
> It shall be an unfair labor practice for an employer—
> (1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 157 of this title;

29 U.S.C. § 158(a)(1) (1976).
> Section 8(a)(3) provides:
> It shall be an unfair labor practice for an employer—

> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:

29 U.S.C. § 158(a)(3) (1976).
> Section 8(a)(4) provides:
> It shall be an unfair labor practice for an employer—

> (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

29 U.S.C. § 158(a)(4) (1976).

**5.** The Board did not consider the § 8(a)(4) charge, 260 N.L.R.B. at 733 n. 6, and it is not before us.

cluded that the Company "has failed to meet its burden of establishing that Peters would have been discharged even in the absence of her protected activities." 260 N.L.R.B. at 733.[6]

■ Viewing the record as a whole we think that the Board's finding that the Company discharged Peters for her union activities is supported by substantial evidence. In the year and a half prior to her discharge, Peters had filed five grievances, three of which were directed against Allen. The ALJ and the Board specifically credited Peters' testimony that Allen told her that she would be fired for filing those grievances and for her other union activities. 260 N.L.R.B. at 732. The Board noted that the delay in Rupert's firing of Peters on February 25 "tends to demonstrate that Allen played a significant role in effectuating Rupert's change of mind and the ultimate decision to discharge Peters." *Id.* at 733. Those facts support a finding of a *prima facie* case of discriminatory discharge. In rejecting the Company's proffered reason for its termination of Peters, the Board found that no probative evidence had been submitted that other similarly situated employees had been discharged under the plant rule concerning medical leave of absences. In light of those findings, and in light of our limited scope of review, we think that the Board was correct in finding that the Company discharged Peters in violation of section 8(a)(1) and 8(a)(3) of the Act. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

## B. Warnings to Longo and Martin

On January 8, 1980, Cameron gave Savini a tour of one of the Company's Mill Hall plants. When the two executives walked by the armature department, they observed employees Bertha Martin and Henry Longo

leaning against some equipment talking for a prolonged period of time. Savini and Cameron interrupted their tour of the facility to watch the two employees. Cameron then sent supervisor Allen to ask the two employees what they were doing. Longo and Martin claimed that they were discussing a work-related problem, but Savini told Allen to write them up anyway. The Company issued a written warning to Longo and a verbal warning to Martin, allegedly because they were talking on the job.

The ALJ found that Longo and Martin had not been discussing their work but rather had been "gossip[ing]." 260 N.L.R.B. at 738. He noted, however, that the Company had produced no evidence of similar disciplinary action taken against other employees for talking on the job. The ALJ concluded that the reason for "Savini's unprecedented action was Longo's status as Union vice president and his grievance and unfair practice filing activities." *Id.* The ALJ thus found that the issuance of the warning notices to Longo and Martin violated sections 8(a)(1) and 8(a)(3) of the Act.

The Board adopted the ALJ's conclusion that the issuance of the warning notices violated the Act. It pointed out, however, that the ALJ had refused to allow the Company to introduce warning notices issued by the Company to other employees engaged in conduct similar to that of Longo and Martin. The Company had tried to offer into evidence fifteen warning notices issued to employees for various infractions, including leaving work stations too early, visiting other departments during working hours, etc. App. at 80–94. Two of the warning notices had been issued to employees for talking on the job. App. at 93, 94. The ALJ had excluded all of those notices as irrelevant. App. at 563–67. The Board concluded that the exclusion was error but that it was not prejudicial to the Company.

---

**6.** Under the Board's *Wright Line* decision, once the General Counsel establishes a *prima facie* case of discriminatory discharge, the burden of persuasion shifts to the employer to show that the employee would have been discharged in any event because of unprotected conduct. The Board's burden shifting scheme was recently approved by the Supreme Court in *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983). *See Behring International, Inc. v. NLRB,* 714 F.2d 291 (3d Cir.1983) (on remand from the Supreme Court).

■ Viewing the record as a whole we think that the Board's finding that the warning notices were issued in violation of the Act is supported by substantial evidence. Longo was the Union's vice-president and had filed a number of grievances against the Company. Credible testimony showed that when Longo and Martin had tried to explain to Allen and Savini what they were talking about, Savini stated, "Shit write them up anyway." 260 N.L.R.B. at 738. Finally the ALJ noted that the Company's argument that Longo and Martin were written up because they were wasting time was not plausible due to the fact that they were never told to return to work when approached by Allen. Based on those determinations and the evidence in the record, we think that the Board's finding that the warnings were given in violation of sections 8(a)(1) and 8(a)(3) was correct.

### C. Warnings to Barry Hill

Employee Barry Hill is a machine operator and chief shop steward of the production workers at the Company's Lock Haven plant. Hill's immediate supervisor is John Kennedy. On April 28, 1980, Hill observed Kennedy performing bargaining unit work. Hill complained to Kennedy that he should not be doing that kind of work. Hill testified that Kennedy's response was, "If I can't be doing things like that, people aren't going to be getting away with things they have been getting away with." App. at 140.

On the following day, Kennedy issued a warning notice to Hill allegedly for Hill's failure to punch his time card before reporting to his work station. Kennedy testified that Hill had failed to punch in on two previous occasions as well. App. at 338. The Company's plant rules list as an offense the "[f]ailure to punch time card without legitimate excuse." App. at 47.

When Kennedy gave Hill the warning on April 29, Hill responded with abusive language directed toward plant manager Cottel. On the same day Hill filed a grievance over the warning notice. On the following

day he filed another grievance alleging that a plant supervisor had violated a Company rule by opening an envelope that had been placed in the interplant mail. Hill presented that grievance to Cottel on April 30. At that meeting Cottel said nothing about Hill's abusive language although Cottel admitted that he knew about Hill's remarks.

Later that morning Cottel approached Hill and asked him to withdraw the mail-opening grievance. Hill refused to withdraw the grievance and credibly testified that Cottel responded, "If you want to play games like that, we can play games too." App. at 149; 260 N.L.R.B. at 741. Two hours later Kennedy told Hill that Cottel had instructed him to give Hill a written warning for abusive language. The Company's plant rules list as an offense the "[u]se of abusive or threatening language towrad [sic] fellow employees or supervisors." App. at 48.

The Company argued that the warning notices were given to Hill because he violated plant rules. The ALJ disagreed, concluding that Kennedy had given Hill the warning notice on April 29 because Hill had exercised his section 7 right to object to Kennedy's performing bargaining unit work. App. at 18. The ALJ concluded that Kennedy had given Hill the warning notice on April 30 because Hill had filed and refused to withdraw the mail-opening grievance. Id. The ALJ thus held that the issuance of the warning notices on April 29 and April 30 violated sections 8(a)(1) and 8(a)(3) of the Act. The Board accepted the conclusions of the ALJ without further discussion.

■ Viewing the record as a whole we conclude that the Board's findings that the Company's warnings to Hill violated the Act is supported by substantial evidence. Although there existed a plant rule concerning punching in on the time clock, the evidence shows that when other employees had forgotten to punch in upon their arrival in the morning, the supervisors simply wrote in their time. 260 N.L.R.B. at 741. A reasonable inference from the evidence is that the April 29 warning was in actuality Kennedy's response to Hill's complaint

about Kennedy doing bargaining unit work. The record also shows that Cottel was unconcerned about Hill's abusive remarks made on April 29 until Hill refused to withdraw his mail-opening grievance. Based on those facts we think that the Board was correct in finding that the written notices were issued in violation of the Act.[7]

### D. Incidents Involving Union Use of the Company Telephone and the Photocopying Machine

#### 1) Use of the Company Telephone

Pursuant to an agreement with the Union, the Company promulgated a written policy concerning the use of Company telephones by Union officials to discuss grievances and emergencies. According to that policy, whenever a chief shop steward or the Union vice-president wants to contact the Union president, he must inform his supervisor so that his supervisor can contact the supervisor of the Union president. The president's supervisor must then inform the Union president of the call and allow him to return the call as soon as possible. App. at 100.

On January 10, 1980, Henry Longo asked his supervisor Calvin Allen to call Union president Mike Smith concerning a grievance. Longo testified that he asked two nearby employees to listen to the conversation because he knew that Allen would refuse his request. App. at 291. Longo and one of the other employees testified that Allen did refuse his request, stating that Longo was causing him too much trouble. *Id.* at 291, 320. The other employee testified that Allen responded, "I don't know, Henry, you can cause me a lot of trouble here." App. at 325. She further testified that Longo and Allen walked away together and that she heard them laugh. App. at 326. Allen testified that he never refused the request. He testified that he tried once unsuccessfully to place the call. He then stated that he became busy with work and forgot to try the call again. He testified that Longo never mentioned it again that day. App. at 487–88.

The ALJ found that Allen did refuse Longo's request but that there was no evidence of other refusals and thus no evidence that the Company had discontinued its policy regarding telephone use. He concluded that the single refusal did not violate sections 8(a)(1), 8(a)(3) or 8(a)(5).[8] The Board reversed, concluding that the single discriminatory refusal was a violation of sections 8(a)(1) and 8(a)(3) of the Act. It also concluded that the refusal was a change in an established condition of employment without giving the Union an opportunity to bargain in violation of sections 8(a)(1) and 8(a)(5).

We will enforce the Board's finding that the company's refusal to allow use of the telephone constituted a violation of section 8(a)(1) and 8(a)(3). Allen's actions occurred only two days after he had filed discriminatory warning notices to Longo and Martin. When Allen refused to make the call, he referred to the fact that Longo had been causing "trouble" for Allen. 260 N.L.R.B. at 733. In response to the General counsel's presentation of proof, the Compa-

---

7. Addressing the April 30 warning, the Company argues that Hill was not engaged in protected activity when he used abusive language. The Company's argument is misdirected. Certainly we agree that "[s]ection 7 rights are ... not a sword with which one may threaten or curse supervisors." *Florida Steel Corp. v. NLRB,* 529 F.2d 1225, 1234 (5th Cir.1976) (citation omitted). Here, however, the General Counsel never argued that Hill's use of abusive language was protected under the Act. The General Counsel instead argued that such language is commonplace in the plant and that the real reason for disciplining Hill was not his language on April 29, but rather his refusal to withdraw his grievance on April 30. Hill's filing of the grievance and his refusal to withdraw it clearly constitute protected activity. *See generally Frank Briscoe, Inc. v. NLRB,* 637 F.2d 946, 949–50 (3d Cir.1981).

8. Section 8(a)(5) provides:

It shall be an unfair labor practice for an employer—
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. § 158(a)(5) (1976).

ny presented no credible evidence of a business justification for the refusal. 260 N.L.R.B. at 739 n. 6. The ALJ specifically discredited Allen's testimony that he simply forgot about the telephone call. *Id.* at n. 4. Viewing the entire record in light of our limited scope of review, we think that the Board was correct in finding a violation of sections 8(a)(1) and 8(a)(3) of the Act.

■ We do not agree with the Board, however, that Allen's actions also constituted a violation of section 8(a)(5). Section 8(a)(5) requires an employer to bargain collectively with representatives of the Union, and section 8(d) establishes the scope of that bargaining obligation. Section 8(d) states that the employer must bargain with the union "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d)(1976). Once a collective bargaining relationship has been established, an employer may not make a change affecting those mandatory bargaining subjects without affording the Union the opportunity to bargain over the change. *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *Leeds & Northrup Co. v. NLRB,* 391 F.2d 874, 877 (3d Cir.1968); *Industrial Union of Marine and Shipbuilding Workers v. NLRB,* 320 F.2d 615 (3d Cir.1963), *cert denied,* 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964); *see also NLRB v. Frontier Homes Corp.,* 371 F.2d 974, 980 (8th Cir.1967) (unilateral alteration of a condition of employment is legally tantamount to a refusal to bargain).

■ In this case, however, the ALJ concluded that there had been no change in the Company's telephone policy, just the single incident involving Longo and Allen. The ALJ concluded that the Company had "adduced credible evidence which demonstrated that the practice has not been disestablished." 260 N.L.R.B. at 739. The Board nowhere disagreed with the ALJ's findings that the alleged "change" in the established telephone policy involved *only* the single incident between Longo and Allen. App. at 37. The record fully supports that conclusion, and the Board's brief does not argue to the contrary.

Given the undisputed record, we disagree with the Board that the single incident here constitutes a section 8(a)(5) violation. Of course we may not substitute our views for any reasonable conclusions of the Board. *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). We, however, can only enforce a Board order if it has "a reasonable basis in law." *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971) (quoting *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944)).

Basing a finding of a section 8(a)(5) violation on the single incident in this case does not have a reasonable basis in law. It is true that a finding of bad faith is not a necessary component of a section 8(a)(5) violation if an employer refuses in fact to confer with the Union before making changes affecting mandatory bargaining subjects. *Katz,* 369 U.S. at 743, 82 S.Ct. at 1111. However, the Board has recently emphasized that a "simple mistake with minimal effect on only a few employees for a brief period of time" does not constitute a section 8(a)(5) violation. *P.A. Inc.,* 259 N.L.R.B. 833, 835 (1982).

Furthermore, common sense dictates that even if Allen's conduct were a discriminatory refusal to allow Longo access to the telephone, that isolated action would hardly constitute a *change* or *alteration* of established Company policy so as to trigger the duty to bargain with the Union. Because the record shows that the Company's policy of allowing Union officials to use the telephone remained unchanged, we will deny enforcement of the part of the Board's order finding a violation of section 8(a)(1) and 8(a)(5).

### 2) *Use of the Company Photocopying Machines*

The Company also has a practice of allowing the Union to use Company photocopying machines to copy grievances and minutes of meetings. The practice is that

Union stewards present the original to a supervisor who has the document copied. The supervisor then returns the original and the copy to the steward.

On January 10 after the incident involving use of the telephone, Longo asked shop steward Steven Workman to go to Ron Rupert's office and make copies of the Union's grievances over the January 8 warning notices to Longo and Martin. When Workman went to Rupert's office, Rupert asked him what he wanted to copy. Workman told him that he wanted to "get copies of grievances for Longo and Martin." App. at 331. Rupert responded, "No." *Id.*

The ALJ concluded that the single refusal did not violate the Act. He concluded that it would "ill serve the purposes and policies of the Act" to issue an order based on the single incident between Longo and Rupert. 260 N.L.R.B. at 740. The Board reversed and concluded that the single refusal violated sections 8(a)(1), 8(a)(3), and 8(a)(5) and that the Company's actions warranted a remedial order.

■ With respect to the section 8(a)(1) and 8(a)(3) allegations, the record shows that the General Counsel has established a *prima facie* case of a discriminatory refusal. Rupert refused the request, contrary to the Company's established practice, after he learned that Workman wanted to copy the grievances concerning the controversial January 8 warning notices. Given the timing of the refusal and the general hostility between the Company and the Union, there is enough evidence in the record to create the inference of a discriminatory motive for Rupert's refusal. *See Texas Department of*

Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The establishment of the *prima facie* case creates a presumption that the Company acted unlawfully. *Id.* at 254, 101 S.Ct. at 1094. The Company has proffered no justification for Rupert's refusal to allow Workman to make copies for Longo. Under the Board's *Wright Line* analysis, the Company's failure to meet its burden of persuasion that it had a non-discriminatory reason for its action results in a finding for the General Counsel. Accordingly, we will enforce that portion of the Board's order finding a violation of sections 8(a)(1) and 8(a)(3).[9] For the same reasons expressed in section D(1) of this opinion, however, we will deny enforcement of the Board's order finding a section 8(a)(5) violation based only on the single refusal by Rupert.

## E. The Change in the Procedure for Photocopying Doctors' Excuses

On January 28, 1980, the Company changed its procedures for allowing employees to copy doctors' excuses on Company copying machines. Prior to that date an employee who wished to photocopy a doctor's excuse would give the excuse to a Union steward who would give it to a supervisor to be copied. The Company unilaterally changed that procedure by requiring employees to give doctors' excuses directly to supervisors instead of routing them through Union stewards. Ron Rupert testified that the Company instituted the change because an employee had failed to get holiday pay because her doctor's excuse never reached her supervisor. App. at 529–31; *see also* app. at 377–78.

**9.** In enforcing that portion of the Board's order, we share the frustration felt by other courts of appeals in considering Board orders based on isolated and trivial violations of the Act. *See American Tel. & Tel. Co. v. NLRB,* 521 F.2d 1159, 1162 (2d Cir.1975); *NLRB v. Columbia Typographical Union No. 101,* 470 F.2d 1274, 1275 (D.C.Cir.1972). We note that although trivial, the Company's action does fit within the literal language of § 8(a)(3). We therefore enforce the Board's order here, but only because we recognize that it is for the Board and not for the courts to determine when an order is necessary to effectuate the policies of the Act. *Vir-*

ginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943); *Interlake, Inc. v. NLRB,* 529 F.2d 1277, 1278 (8th Cir.1976); *Peerless Food Products, Inc.,* 236 N.L.R.B. 161, 162 (1978) (Member Penello, concurring) ("The Board has latitude not to burden itself and the courts with 'infinitesimally small abstract grievances.' ... But where to draw the line of matters trivial in their impact is primarily a task for the Board and not for the court.") (quoting *Truck Drivers, Oil Drivers, Filling Station and Platform Workers Local No. 705 v. NLRB,* 509 F.2d 425, 428 (D.C.Cir.1974) (per curiam)).

The General Counsel alleges that the Company violated sections 8(a)(5) and 8(a)(1) by instituting the change in the procedure for copying doctors' excuses without bargaining with the Union. The ALJ found that the Company had not violated the Act because the Union knew of the change and waived its right to bargain over it. The Board reversed, holding that there was no evidence in the record to indicate that the Union had sufficient notice of the change so as to be able to request bargaining.

■ We conclude that the Company's change does not violate sections 8(a)(5) and 8(a)(1) because the procedure for photocopying doctors' excuses is not a mandatory subject of bargaining.[10] Read together, sections 8(a)(5) and 8(d) establish the obligation of the employer and the representative of its employees to bargain in good faith but only with respect to "wages, hours, and other terms and conditions of employment." Congress did not explicitly define those terms, but clearly they are intended as words of limitation on the obligation to bargain. *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 220, 85 S.Ct. 398, 407, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring). In *Ford Motor Co. v. NLRB,* 441 U.S. 488, 496, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979), the Supreme Court recognized that the Board has the primary responsibility for interpreting the statutory language and the scope of the duty to bargain. The Supreme Court further noted that the judgment of the Board is subject to judicial review, but "if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute." *Id.* at 497, 99 S.Ct. at 1849 (quoting *NLRB v. Iron Workers,* 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978); *accord Latrobe Steel Co. v. NLRB,* 630 F.2d 171, 176 (3d Cir.1980).

Because the Board concluded that the Company had violated section 8(a)(5) in instituting the change in the procedure for copying doctors' excuses, it must have concluded that the procedure was a mandatory subject of bargaining. It, however, did not address that issue specifically nor did it give any reasons in support of what must have been its conclusion. Because it has given us no indication of the basis for its holding, we would abdicate our responsibility if we simply accorded blind deference to the Board in this case.

Turning to the facts in this case, an employee can only receive wages for days when he is absent because of illness if his supervisor receives a doctor's excuse explaining his absence. App. at 530. The record indicates that employees wish to keep their own copies of doctors' excuses in case the supervisor loses an excuse. App. at 196. Thus the Company's practice of allowing employees to make copies of doctors' excuses directly assists them in receiving the wages that they are due.

The unilateral change at issue here, however, does not involve the Company's discontinuance of the practice of allowing employees to copy doctors' excuses. At issue here is a change in the procedure for making those copies. Under the new procedure, the employee must deal directly with his supervisor in order to receive his copies.

However, regardless of whether the Union steward hands the doctors' excuses to the supervisor for copying or whether the employee does so himself, the employee is still able to secure the copies. There is no evidence in the record that the procedural change has adversely affected the employees' ability to make their copies and collect their wages. Thus the change in procedure, if it has any effect at all, has only a minimal effect on the employees' wages, hours, and terms and conditions of employment. Such an indirect bearing is not sufficient to establish that the procedure for copying the doctors' excuses is a mandatory subject of bargaining. *See NLRB v. Local 264,* 529 F.2d 778, 786 (8th Cir.1976) (provision is nonmandatory if it has only "remote, indirect and incidental impact" on condition of employment); *Seattle First National Bank*

---

**10.** Given that holding, we need not address the contrary conclusions of the ALJ and the Board concerning whether the Union waived its right to bargain over the change.

*v. NLRB,* 444 F.2d 30, 33 (9th Cir.1971) (same); *see also Weather Tec Corp.,* 238 N.L.R.B. 1535, 1536 (1978); *Peerless Food Products, Inc.,* 236 N.L.R.B. 161, 161 (1978) (only "material, substantial, and . . . significant" unilateral changes violate § 8(a)(5)) (quoting *Rust Craft Broadcasting of New York, Inc.,* 225 N.L.R.B. 327, 327 (1976)).[11]

We therefore conclude that the Company's procedure for allowing employees to copy doctors' excuses is not a mandatory subject of bargaining. Because the unilateral modification of a nonmandatory subject does not violate the Act, *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 185, 92 S.Ct. 383, 400, 30 L.Ed.2d 341 (1971), we will deny enforcement of the portion of the Board's order relating to the section 8(a)(5) and 8(a)(1) violation.

### III

We will enforce that portion of the Board's order finding that the Company violated sections 8(a)(1) and 8(a)(3) by its discharge of Peters, by its warning notices to Longo and Martin, by its warning notices to Hill, by its refusal to allow Longo to use the Company telephone, and by its refusal to allow Workman to make copies of grievances for Longo on Company photocopying machines. We will deny enforcement of that portion of the Board's order finding that the Company violated sections 8(a)(1) and 8(a)(5) by refusing to allow Longo to use the Company telephone, refusing to allow Workman to use the Company photocopying machine, and changing the procedure for copying doctors' excuses.

---

**11.** We have also recognized that an employer violates sections 8(a)(5) and 8(a)(1) if he institutes changes in work conditions which are non-material but which are designed by their timing and wording to undermine the union as the employees' bargaining representative. *See Hedstrom Co. v. NLRB,* 629 F.2d 305, 317 (3d Cir.1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); *Flambeau Plastics Corp. v. NLRB,* 401 F.2d 128, 134 (7th Cir.),

*cert. denied,* 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1968). In this case, however, there is no finding that the Company instituted the change in procedure in order to undermine the Union. The ALJ credited the testimony of Ron Rupert that the Company instituted the change because one employee failed to get holiday pay because her doctor's excuse never reached her supervisor. App. at 14.