MICROIMAGE DISPLAY DIVISION
OF XIDEX CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Local 619, Allied Industrial Workers of
America, AFL–CIO, Intervenor.

LOCAL 619, ALLIED INDUSTRIAL
WORKERS OF AMERICA,
AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 89–1707, 89–1777.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 19, 1990.

Decided Jan. 18, 1991.

Rehearing and Rehearing En Banc
Denied in No. 89–1707 March 4, 1991.

Kenneth R. Loebel, Milwaukee, Wis., for Local 619, Allied Indus. Workers of America, AFL–CIO, petitioner in No. 89–1777 and intervenor in No. 89–1707.

Kevin J. Kinney, Milwaukee, Wis., for Microimage Display Div. of Xidex Corp., petitioner in No. 89–1707.

Joseph A. Oertel, Atty., N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., was on the brief, for respondent. Charles P. Donnelly, Atty., N.L.R.B., Washington, D.C., also entered an appearance for respondent.

Before WALD, Chief Judge, RUTH BADER GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge HENDERSON.

HENDERSON, Circuit Judge:

In this proceeding, we address both the employer's and the union's exceptions to a ruling of the National Labor Relations Board (Board). In late 1987 and the first half of 1988, the union filed a series of unfair labor practice charges with the Board. The Board's General Counsel issued complaints on the charges and they were consolidated for hearing before an Administrative Law Judge (ALJ). In February, 1989, the ALJ issued his decision. The employer, the union and the General Counsel all filed exceptions to the ALJ's decision. In October, 1989, a three-member panel of the Board issued its decision, affirming in part and reversing in part the ALJ's order. Both the employer and the union have petitioned this court for review of the Board's ruling. The Board has cross-petitioned for enforcement of its order. We address the issues in the petitions for review *seriatim* below, setting out our reasons for enforcing the Board's order.

## I. BACKGROUND

In 1987 and 1988, the employer, Microimage Display Division of Xidex Corp. (Xidex), manufactured microfilm readers and reader/printers at two separate facilities in Wisconsin. The employer owned a large plant in Hartford and leased space for its smaller plant in the town of Iron Ridge. In 1986, the employer had purchased the Hartford facility from another corporation. At the time of the sale, Xidex assumed the collective bargaining agreement then in effect at the Hartford plant. The labor contract had been negotiated by Local 619 of the Allied Industrial Workers of America, AFL–CIO, the union that had long represented the Hartford employees. This agreement was set to expire on April 3, 1988. The Iron Ridge employees were not represented by a union.

Even before the purchase of the Hartford plant was complete, officers of Xidex Corp. began developing a strategy to oust the union. According to testimony the ALJ credited, the employer's vice president for human resources stated that the corporation was not interested in negotiating a new contract with the union. He intended to develop a strategy that would allow the corporation to avoid a new contract, merge the two plants and have the resulting operation be nonunionized. Over the course of the months following Xidex's purchase of the Hartford facility, the employer undertook a number of actions that the union assigned as unfair labor practices.

### A. Unilateral Change of Lunch Break

In August of 1987, three months before the events on which this proceeding primarily focuses, the employer changed, for two days, the lunch break of the employees on the paint line at the Hartford plant. At an employee meeting, one of the line employees suggested that, to increase the line's

productivity, the employees should have a fifteen-minute, paid lunch break rather than the thirty-minute, unpaid break they had previously received. The other line employees agreed to the change and the company put it into effect. The supervisor did not consult the union before implementing the change. Two days later, when the employees expressed dissatisfaction with the new arrangement, the supervisor reinstated the previous lunch schedule.

After the hearing, the ALJ noted that the failure to consult the union before implementing the new lunch schedule "telegraph[ed] to the employees that the Union was irrelevant." Petitioner's Appendix (P.A.) 590. The ALJ held that this unilateral change in an employment condition violated sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act (the Act or NLRA). The Board affirmed the ALJ's ruling with one member dissenting. The dissenting Board member would have found no violation involving the change in lunch schedule because of the "insubstantial nature of the change." P.A. 576 n. 2.

## B. Threat to Move Work From the Union to the Non–Union Plant

On November 25, 1987, the director of operations at the Hartford plant announced to the plant's managers that, within a month, Xidex would move a production group known as the power drawer module (PDM) department from the Hartford to the Iron Ridge plant. Earlier, the employer had moved product lines from the unionized to the non-union plant but those transfers had resulted in no work force reduction. Management projected that the PDM transfer, on the other hand, would cause the layoff of 22 or 23 employees at the Hartford facility. Because of the timing of the work transfer, the layoffs would occur shortly before Christmas. As the reason for the move, the employer cited the greater productivity and flexibility of the employees at the Iron Ridge plant. The employees learned of the planned work transfer on December 1.

The following day, a group of employees approached the employer's director of operations, seeking information about how to decertify the union. Through him, they learned the telephone number of the Board's regional office and from the Board they learned the proper form for a decertification petition. The same day, the employees drew up a petition and began circulating it, encouraging their co-workers to sign it "to save PDM." P.A. 230. Within two days, the employees circulating the petition had secured the signatures of a majority of the Hartford plant's 165 employees. In the end, 108 employees signed the petition.

At some point after the petition began to circulate, the employer decided to postpone the PDM transfer and the attendant layoffs. There was conflicting evidence on the question of when the employer announced this decision. Certain employees testified that their managers announced the postponement of the move on December 3, the day after the employer learned of the decertification petition.[1] The director of operations, on the other hand, testified that the decision to put off the department transfer did not occur until later that month when the employer learned of several large orders it had received that made the move and work force reduction appear unwise. The ALJ credited the employees' testimony, finding the evidence showed that the move was postponed immediately after the employer learned of the decertification petition.

On January 12, 1988, the employees filed the decertification petition with the Board's regional office. On the same day, the employer withdrew its recognition of the union, pointing to the petition as evidence of the union's lack of majority support. Xidex stated, however, that it planned to continue to honor the terms of the existing collective bargaining agreement until it expired. After the employer terminated recognition of the union, the employer began

---

1. At the hearing, a PDM department employee testified that she was certain the move was postponed the day after the petition began to circulate. P.A. 144–48. An employee from another department corroborated this sequence of events. P.A. 158.

transferring work to, rather than away from, the Hartford plant. At the expiration of the contract later that year, the employer unilaterally changed several terms and conditions of employment at the Hartford plant.

The ALJ held that the employer's threat to move the PDM department to the Iron Ridge facility violated section 8(a)(1) of the Act. He further held that the employer's threat tainted the decertification petition and that the withdrawal of union recognition, based as it was on the petition, violated sections 8(a)(5) and 8(a)(1) of the Act. On review, the Board affirmed the ALJ's holding. It concluded that the employer's announcement of a transfer for reasons "shown by the record to be transparently baseless would reasonably tend to lead employees to infer that they were losing work and jobs as a result of their support for the Union." P.A. 576 n. 2.

## C. One–Day Transfer of a Vocal Union Supporter

While the decertification petition was circulating among the employees, Cheryl Sadowski was vocal in her support of the union as she moved about the Hartford plant performing her job in the shipping department. On the day Xidex withdrew recognition from the union, Sadowski learned that, starting the following day, she was to be transferred to another job, one that did not permit her to move about the plant. Her supervisor told Sadowski she was being transferred because of complaints about her discussion of the union during work hours. Sadowski complained to the union president; together they confronted the supervisor and the supervisor returned Sadowski to her previous position. The transfer was in effect for only one day and Sadowski suffered no loss in pay or benefits as a result of it.

The ALJ concluded Sadowski's transfer represented at most a *de minimis* violation of the Act. The Board reversed, stating that the transfer "must be viewed in the context of the [employer's] other unfair labor practices, specifically including a simultaneous withdrawal of recognition

from the Union and an antecedent threat to transfer unit employees' work to a nonunionized facility in order to undermine the Union." P.A. 580. In light of these considerations, the Board held that the transfer constituted a "substantial violation of Section 8(a)(3) requiring a traditional board remedy." P.A. 580.

## D. Employer's Publication of Its Views on the Union

After the decertification petition circulated, Xidex published several different notices at the Hartford plant, informing the employees of the progress of the unfair labor practice charges, stating the employer's belief that the employees would be better off without the union and denying rumors that, if the union were decertified, the employer would cut wages. The ALJ found that none of these publications amounted to an unfair labor practice. He noted that all of the publications occurred after the employees had signed the petition and they therefore could not have affected the employees' decision to decertify the union. The ALJ also found that, under section 8(c) of the Act, the employer communications could not constitute unfair labor practices since they embodied the employer's views and opinions and contained no threat of reprisal. With one member dissenting with respect to one of the publications, the Board affirmed the ALJ's decision.

## E. Employer's Failure to Arbitrate Grievances

Before the decertification process began, the union had filed two grievances on which it sought arbitration. The employer contested the arbitrability of the grievances and therefore did not respond to the union's request to select arbitrators. At the unfair labor practice hearing, the union alleged that this amounted to a refusal to arbitrate violative of the Act. The ALJ agreed, ruling that the question of arbitrability itself is a subject for arbitration and that, by failing to proceed with the arbitration and raise the question of arbitrability as a defense before the arbitrator, the em-

ployer violated sections 8(a)(5) and 8(a)(1) of the Act. The Board reversed, holding that the employer at no time refused to arbitrate the grievances in question. The Board stated that, unless a collective bargaining agreement specifies otherwise, questions of arbitrability present "a threshold issue for judicial determination" and the employer did not breach its duty to bargain by refusing to submit its arbitrability objections to arbitration. P.A. 578.

## II. EMPLOYER'S PETITION FOR REVIEW

At the outset we note the deference that we extend to the Board's factual determinations. Section 10(e) of the Act provides that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). A reviewing court is not to "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *see also NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962); *St. Francis Fed'n of Nurses & Health Professionals v. NLRB*, 729 F.2d 844, 849 (D.C. Cir.1984) (deferring to Board's "reasoned exercise of its expert judgment"); *Conair Corp. v. NLRB*, 721 F.2d 1355, 1373 (D.C. Cir.1983), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984). Finding that substantial evidence supports the Board's decision, we reject the employer's challenges.

### A. Work Transfer

Section 7 of the Act guarantees employees the "right to self-organization, to form, join, or assist labor organizations ... and to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exer-

cise of the rights guaranteed in section 7." 29 U.S.C. § 158(a)(1).

Section 8(a)(1) is the blanket 8(a) provision that shields employees from unfair labor practices. In most unfair labor practice cases, the Board has rested its decisions primarily on the particularized provisions of 8(a)(2)–(5); in such cases, the Board has found that the employer has violated section 8(a)(1) only derivatively. The Board has found independent violations of section 8(a)(1) under two different circumstances. First, the Board has concluded that the employer's actions have infringed on section 7 rights in a manner that outweighs the business justification the employer offers for those actions. *Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263, 269, 85 S.Ct. 994, 998, 13 L.Ed.2d 827 (1965); *see also NLRB v. Brown*, 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965) (approving finding of § 8(a)(1) violation when "employers' conduct is demonstrably so destructive of employee rights and so devoid of significant service to any legitimate business end that it cannot be tolerated consistently with the Act"); *American Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 309, 85 S.Ct. 955, 962, 13 L.Ed.2d 855 (1965) (approving finding of § 8(a)(1) violation based on acts inherently "destructive of collective bargaining"). Alternatively, the Board has found violations of section 8(a)(1) alone when antiunion animus has motivated the employer's actions. When established by independent evidence, "antiunion motivation will convert an otherwise ordinary business act into an unfair labor practice." *Brown*, 380 U.S. at 287–88, 85 S.Ct. at 985–87; *see also NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 227, 83 S.Ct. 1139, 1144, 10 L.Ed.2d 308 (1963).

■■■ The petitioner employer assigns as error two aspects of the Board's ruling that the threatened work transfer constituted an independent violation of section 8(a)(1). First, Xidex attacks the finding that antiunion sentiment motivated the work-transfer decision. In light of the deference, discussed above, that we accord Board findings of fact, we reject this argument. There is ample evidence from which

the Board could have concluded that the employer's decision to move the PDM department to the nonunion plant arose from a desire to be rid of the union. Before Xidex had even finalized its purchase of the Hartford facility, its management was plotting a "strategy to avoid a [new union] contract through whatever means." [2] P.A. 29. Furthermore, the ALJ found that the employer called off the PDM transfer the day after it learned of the petition. After the employees submitted the petition to the Board, the operations manager began transferring production units from Iron Ridge to Hartford, although he had earlier stated his intention to move everything to the nonunion Iron Ridge plant even if he had to "build it in the back of semi trucks." P.A. 309. We find, as did the Board, the employer's conduct after the decertification petition to be instructive on the question of the employer's motive for announcing the PDM transfer.[3]

■ Second, Xidex argues that the Board erred in finding a section 8(a)(1) violation because, in moving the PDM department, the employer was exercising a right it had reserved under the collective bar-

gaining agreement and because the employer offered evidence that legitimate business considerations prompted it to undertake the move. The ALJ's finding that antiunion animus was the motivating factor behind the PDM move deprives Xidex of the defense that its legitimate reasons for planning the move might otherwise afford it. "When specific evidence of a subjective intent to discriminate or to ... discourage union membership is shown, and found, many otherwise innocent or ambiguous actions which are normally incident to the conduct of a business may, without more, be converted into unfair labor practices." *Erie Resistor Corp.*, 373 U.S. at 227, 83 S.Ct. at 1145; *see also Associated Press v. NLRB*, 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953 (1937). Although a showing of antiunion animus does not automatically establish a violation of section 8(a)(1), it places on the employer the burden to prove that it would have undertaken the action alleged to be an unfair labor practice even in the absence of the antiunion sentiment. *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083, 1088–89 (1980); *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76

2. The conversations in which a Xidex manager declared his intent to develop a strategy to rid the company of the union occurred more than six months before the union filed unfair labor practice charges in this case. Xidex argues that section 10(b) of the Act operates to prevent the consideration of these conversations as evidence of the employer's antiunion animus. Section 10(b) establishes a six-month limitations period:

> [N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made.

29 U.S.C. § 160(b). The conversations in question are not, however, alleged to be unfair labor practices in and of themselves nor has the General Counsel issued complaints based on them. The Board properly considered them merely as evidence of the intent motivating the employer to take the actions charged as unfair labor practices. *See International Ass'n of Machinists v. NLRB*, 362 U.S. 411, 416, 80 S.Ct. 822, 827, 4 L.Ed.2d 832 (1960) ("earlier events may be utilized to shed light on the true character of matters occurring within the limitations period"); *United Packinghouse, Food and Allied Workers Int'l Union v. NLRB*, 416 F.2d 1126,

1138 n. 8 (D.C.Cir.), *cert. denied,* 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *NLRB v. Instrument Corp. of America,* 714 F.2d 324, 329 n. 7 (4th Cir.1983).

The employer further contends that these conversations are protected by section 8(c) of the Act which provides that "[t]he expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). We also reject this argument. During the conversations, members of the employer's management discussed strategy to oust the union. These conversations do not represent the expression of "views, argument, or opinion" that section 8(c) covers. *See Darlington Mfg. Co. v. NLRB,* 397 F.2d 760, 768–69 (4th Cir.1968) (en banc), *cert. denied,* 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969).

3. Xidex argues that the Board erred in considering its conduct after the petition in order to determine the presence of antiunion animus. While this conduct might not, by itself, establish that antiunion sentiment motivated Xidex's announcement of the PDM transfer, it provides further support for the reasonable inference to that effect that the Board drew from other portions of the record.

L.Ed.2d 667 (1983). Here, the employer failed to carry its burden; the Board was therefore justified in finding a violation of section 8(a)(1).

### B. Transfer of Sadowski Based on Her Union Sympathies

■ Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). There is little doubt that the transfer of Sadowski qualifies as "discrimination in regard to ... [a] term or condition of employment." It therefore comes within the scope of section 8(a)(3). The dispositive question then becomes the motive behind the employer's action: "[t]he discriminatory act is not by itself unlawful unless intended to prejudice the employees' position because of their membership in the union; some element of antiunion animus is necessary." *Brown*, 380 U.S. at 286, 85 S.Ct. at 985; *see also Radio Officers' Union v. NLRB*, 347 U.S. 17, 42–44, 74 S.Ct. 323, 336–338, 98 L.Ed. 455 (1954). In determining the employer's motivation, the Board may rely on either direct or circumstantial evidence. *NLRB v. Link–Belt Co.*, 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941); *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 955 (D.C. Cir.1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989); *United Food & Commercial Workers Int'l Union, Local 152 v. NLRB*, 768 F.2d 1463, 1475 (D.C.Cir.1985).

■ Here, in determining that antiunion animus motivated the employer, the Board stated that Sadowski's transfer "must be viewed in the context of the Respondent's other unfair labor practices, specifically including a simultaneous withdrawal of recognition from the Union and an antecedent threat to transfer unit employees' work to a nonunionized facility in order to undermine the Union." P.A. 580. In addition to this background, the Board considered the facts that Sadowski's new position significantly curtailed her contact with other employees and that her transfer occurred the day after Xidex withdrew recognition of the union. This constitutes substantial evidence from which the Board was justified in drawing the inference of improper motivation on Xidex's part.

In an attempt to provide a valid business justification for Sadowski's transfer, the employer points to evidence of mistakes she had made in her job with the shipping department. Here again, under *Wright Line*, the evidence of antiunion animus placed on Xidex the burden to establish a permissible, non-discriminatory motive for Sadowski's transfer. It failed to convince the Board that its intentions were pure and, under our deferential standard of review, we are not prepared to reach a different conclusion. *See Conair Corp.*, 721 F.2d at 1373.

The employer also argues that, regardless of the presence of antiunion animus, Sadowski's one-day transfer is, at most, a *de minimis* violation of the Act that does not justify the finding of an unfair labor practice. In determining what conduct violates section 8(a)(3) and justifies a remedial order under the Act, especially when there is ample evidence of antiunion animus behind the contested action, we accord the Board a wide measure of discretion. *See Champion Parts Rebuilders, Inc. v. NLRB*, 717 F.2d 845, 853 n. 9 (3d Cir.1983) (citing *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)); *see also Truck Drivers, Oil Drivers, Filling Station and Platform Workers Local No. 705 v. NLRB*, 509 F.2d 425, 428 (D.C.Cir.1974) (per curiam) ("where to draw the line of matters trivial in their impact is primarily a task for the Board and not for the court"). In this instance, the Board's determination that Sadowski's transfer violated the Act is one that we will not reverse.

### C. Two–Day Change in the Paint Line's Lunch Break

■ Under section 8(a)(5) of the Act, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29

U.S.C. § 158(a)(5). Mandatory subjects of bargaining include "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). In unilaterally changing a condition of employment, an employer violates section 8(a)(5). *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 674–75, 101 S.Ct. 2573, 2578–79, 69 L.Ed.2d 318 (1981); *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962).

■ Xidex does not contend that the Board erred in finding the change in lunch break amounted to a unilateral change in a mandatory subject of bargaining. Instead it argues, as it did with respect to Sadowski's transfer, that the lunch break change is only a *de minimis* violation that is too insubstantial to support the finding of an independent unfair labor practice. We are unpersuaded by the employer's reasoning. The Board has recognized that not every minor unilateral change in working conditions constitutes an unfair labor practice. To violate section 8(a)(5), the change in working conditions must be "material, substantial and significant." *See Alamo Cement Co.*, 281 NLRB 737, 738 (1986); *Peerless Food Prods., Inc.*, 236 NLRB 161 (1978); *Rust Craft Broadcasting of N.Y., Inc.*, 225 NLRB 327 (1976). In this case, the Board and the ALJ found that the lunch break change rose to the level of a violation of section 8(a)(5) because of the context in which it occurred. The Board found that the employer undertook this action as part of its concerted strategy to weaken and discredit the union in the eyes of the employees. It was an action that "could not help but undermine support for the Union," and by unilaterally implementing the change, the employer was "telegraphing to the employees that the Union was irrelevant." P.A. 590–91. Viewed in this light, the Board held, and we agree, the apparently unimportant change in a working condition takes on more significance.[4]

Had the lunch break change occurred in isolation, with no other manifestation of the employer's opposition to the union, we might be more inclined to conclude that the two-day lunch break change did not constitute an independent violation of the Act. That, however, is not the situation with which we are presented. Here, by the time it changed the lunch break, the Board found, the employer had already expressed its desire to rid itself of the union "through whatever means." P.A. 29. After the change, the evidence shows the employer threatened, in bad faith, to move production to a nonunion plant and discriminated against an employee because of her support for the union. Given the surrounding violations of the Act, we decline to hold that the unilateral lunch break change was too insignificant to violate the Act. *Cf. Truck Drivers*, 509 F.2d at 427 (considering context of union's "single remark" in finding it violated the Act).

### D. Withdrawal of Union Recognition

■ We also affirm the Board's conclusion that, in withdrawing recognition from the union, the employer violated sections 8(a)(5) and 8(a)(1) of the Act. Once certified, a union enjoys a presumption of majority support that is irrebuttable for a year after certification and that continues thereafter until the employer can show, by "clear, cogent and convincing" evidence, either that the union has lost majority support or that the employer has a reasonable, good-faith doubt of continuing majority support. *St. Agnes Medical Ctr. v. NLRB*, 871 F.2d 137, 145 (D.C.Cir.1989); *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1300 (D.C.Cir.1988) (quoting *NLRB v. Tahoe Nugget*, 584 F.2d 293, 297 (9th Cir. 1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979)). Nevertheless, "an employer that has itself orchestrated the union ousting campaign cannot rely on the pendency of a decertification petition or the loss of majority status to justify its withdrawal of recognition, and refusal to bargain with, the incumbent representative." *NLRB v. Maywood Plant of Grede Plastics*, 628 F.2d 1, 5 (D.C.Cir.1980)

---

4. In reaching a decision with respect to the lunch break change, neither the ALJ nor the Board discussed whether Xidex's action was sufficiently material to constitute an unfair labor practice.

(per curiam). The record supports the Board's conclusion that the employer's unfair labor practices, not a bona fide dissatisfaction with the union, caused the employees to begin circulating the decertification petition. The employer may not rely on the petition as justification for the withdrawal of union recognition. Without objective evidence to support its doubt about the union's continuing majority status, we conclude the employer violated sections 8(a)(5) and 8(a)(1) by withdrawing recognition of the union.

## III. UNION'S PETITION FOR REVIEW

The union assigns as error several aspects of the Board's order. We find none of the union's arguments meritorious and affirm without modification those portions of the order the union challenges.

### A. Blanket Reinstatement Order

■ First, the union contends the Board erred in failing to order the reinstatement of all employees Xidex has discharged since its unlawful withdrawal of union recognition and refusal to negotiate a new collective bargaining agreement. The expired union contract provided that the employer could terminate employees only for just cause. After the contract's expiration, however, under the applicable state law, Xidex's employees were terminable at will. The union asserts that this change in status justifies a blanket order of reinstatement.

The Board's order requires the employer to

> rescind changes that the [employer] made unilaterally in the terms and conditions of employment of its employees on and after April 4, 1988 [the contract termination date] and [to] maintain those reinstated terms and conditions of employment until such time as the [employer] negotiates in good faith to a new agreement or to impasse.

P.A. 582–83. The order further requires the employer to "[m]ake employees whole ... for any loss of earnings and benefits suffered as a result of the [employer's] unlawful unilateral changes in their terms and conditions of employment." P.A. 583. This order adequately protects the interests of Xidex's employees and we decline to modify it. In the first instance, we extend broad deference to the Board's choice of remedies. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898–99, 104 S.Ct. 2803, 2812–13, 81 L.Ed.2d 732 (1984); *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969). Only when a remedy is "clearly inadequate" will we upset the Board's choice of how best to effectuate the policies of the Act. *International Union of Elec., Radio & Mach. Workers, Local 806 v. NLRB*, 434 F.2d 473, 478 (D.C.Cir.1970). The union has failed to show that the Board's order falls short of this standard. The effect of the order is to grant make-whole relief to those employees discharged without good cause. Ordering the reinstatement of those employees discharged for cause would itself violate the Act and the Board properly declined to do so.[5]

### B. Dues Check-Off

■ The union next contends that the Board erred in failing to order the employer to pay to the union the money that the union would have received had the dues check-off provision of the expired collective bargaining agreement remained in effect. This was not error on the Board's part. Section 8(a)(3) of the NLRA and sections 302(a)(2) and 302(c)(4) of the Labor Management Relations Act, 29 U.S.C. §§ 186(a)(2), 186(c)(4), permit an employer to make payments to a union only under a dues check-off provision contained in an effective collective bargaining agreement.

---

5. Section 10(c) states that "[n]o order of the Board shall require the reinstatement of any individual as an employee ... if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c).

The union also argues that the Board should have issued a blanket reinstatement order because, after the contract expired, discharged employees did not receive the benefit of union representation during their discharge proceedings. We decline to address this argument. It may properly be raised before the Board in the compliance stage of these proceedings.

*Southwestern Steel & Supply, Inc. v. NLRB*, 806 F.2d 1111, 1114 (D.C.Cir.1986). The collective bargaining agreement had expired and, accordingly, the Board properly refused this portion of the union's requested order.

### C. Visitatorial Clause

The union asserts that the Board erred in refusing to include in its order a broad visitatorial clause that would enable the Board to monitor the employer's compliance with the other portions of the order. The order requires Xidex to "[p]reserve and, on request, make available to the Board or its agents for examination and copying, all payroll records, social security payment records, timecards, personnel records and reports, and all other records necessary to analyze the amount of backpay due under the terms of the Order." P.A. 583. The union has not shown any way in which the Board's order is inadequate; in the absence of such a showing, we decline to substitute our judgment for the Board's on the question of the proper remedy. *See Sure–Tan, Inc.*, 467 U.S. at 898–99, 104 S.Ct. at 2812–13. It is Board policy to include the broad visitatorial clause the union seeks only when the employer appears likely to resist complying with the other terms of the order. *See Cherokee Marine Terminal*, 287 NLRB 1080, 1083 (1988). The union has been unable to point to any evidence of this sort; without it, we decline to modify this portion of the order.

### D. Employer's Publications Regarding the Union

We have examined the documents that the employer published to its employees and remain unpersuaded by the union's contention that the publications violated the Act. The Board reasonably read the notices as noncoercive expressions of the employer's "views, argument, or opinion" regarding the union. NLRA § 8(c), 29 U.S.C. § 158(c). The union has failed to identify any particular in which the publications offend the Act. As long as the publications contain "no threat of reprisal or force or promise of benefit," *id.*, "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union." *Gissel Packing Co.*, 395 U.S. at 618, 89 S.Ct. at 1942. We affirm the Board's decision that these notices to employees did not constitute violations of the Act.

### E. Employer's Failure to Arbitrate Grievances

We also agree with the Board that Xidex's delay in submitting to arbitration did not violate sections 8(a)(5) and 8(a)(1) of the Act. The employer's position did not amount to a repudiation of its duty to arbitrate under the union contract. Instead, the delay resulted from its position that, under the collective bargaining agreement, it had no duty to arbitrate the particular grievances in question. The Board correctly ruled that the threshold question of arbitrability is one for the courts, not for arbitration, and the employer's delay in choosing arbitrators therefore presented no violation of the NLRA. *See AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 759 (D.C.Cir.1988).[6]

### IV.

We reject, in their entirety, the petitions for review of both the employer and the union. Accordingly, we direct that the Board's order in this proceeding be

Enforced.

---

6. The union contends that the employer's delay in submitting to arbitration as well as its distribution of antiunion literature, although not independent unfair labor practices, violate the Act because they occurred at the time the employer was conducting a campaign to discredit the union. This argument lacks merit. The circumstances surrounding these otherwise permissible actions did not transform them into violations of the Act.