Dorothy L. **MOORE–DUNCAN** ex rel. **NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALDWORTH COMPANY, INC. and Dunkin' Donuts Mid–Atlantic Distribution Center, Inc., Respondents.**

No. CIV. 99–CV–3568 (JBS).

United States District Court, D. New Jersey.

Dec. 20, 2000.

Richard P. Heller, Deena E. Kobell, N.L.R.B., Fourth Region, Philadelphia, PA, for Petitioner.

Paul J. Kingston, Kingston & Hodnett Boston, MA, Frank V. Tedesco, Dilworth, Paxson, Kalish & Kauffman, Cherry Hill, NJ, for Respondent Aldworth Company, Inc.

Mark Peters, Mahoney, Hawkes & Goldings, LLP, Boston, MA, Sharon P. Margello, Staton, Hughes, Diana, Salsbert, Cerra & Mariani, P.C., Morristown, NJ, for Respondent Dunkin' Donuts Mid–Atlantic Distribution Center, Inc.

## *OPINION*

SIMANDLE, District Judge:

## TABLE OF CONTENTS

I. *INTRODUCTION* ...............................................274

II. *JOINT EMPLOYER ISSUE* ...........................................274
 A. *The Respondents' Functions* ..........................................275
 B. *Uniforms* ..................................................276
 C. *Employees' Wages & Benefits* ........................................276
 D. *Dunkin' Donuts' Hiring/Firing/Discipline Power at the Facility* ............276
 E. *Dunkin' Donuts' Scheduling Responsibilities* ...............................277
 F. *Interpretation of Government Regulations* ...............................278
 G. *Analysis* ..................................................278

III. *BACKGROUND OF UNION ORGANIZING EFFORT* ........................278

IV. *DISCUSSION* ..................................................280
 A. *Scope of Review Under Section 10(j) of the NLRA* ..........................280
 B. *Whether Reasonable Cause Exists to Believe That An Unfair Labor Practice Has Occurred* ..........................................280
 1. *Alleged Section 8(a)(1) Violations* .....................................280
 a. *Anti–Union Group Meetings* ....................................281
 b. *Individual Conversations with Employees* ..........................282
 2. *Alleged Section 8(a)(3) Violations* .....................................283
 a. *Leo Leo's Termination* ........................................283
 b. *William McCorry's Suspension* ..................................284
 c. *The "Freezer Incident" Suspensions* ...............................284
 d. *Selection Accuracy Program* ....................................285
 e. *Moss's Termination* ..........................................287
 3. *Alleged Section 8(a)(5) Violations* .....................................288
 a. *Refusal To Bargain* ..........................................288
 b. *Selection Accuracy Program Changes* ............................289
 4. *Imposition of Bargaining Order* .....................................291

C. *Whether 10(j) Relief Is "Just and Proper"* ...............................293

V. *RESPONDENTS' JOINT LIABILITY* ....................................294

VI. *CONCLUSION* ..............................................295

## I. INTRODUCTION

This matter comes before the Court upon a petition by the Regional Director of the National Labor Relations Board ("NLRB" or "Board") for a temporary injunction pursuant to section 10(j) of the National Labor Relations Act (the "Act"), as amended, 29 U.S.C. § 160(j). The petition follows the issuance of an unfair labor practice complaint under section 10(b) of the Act alleging that respondents Aldworth Company ("Aldworth") and Dunkin' Donuts Mid Atlantic Distribution Facility ("Dunkin' Donuts") have engaged, and are engaging in, unfair labor practices within the meaning of sections 8(a)(1), (3) and (5) of the Act by dissuading and/or coercing employees from unionizing, suspending or firing workers suspected of union involvement, and by refusing to negotiate with a duly elected majority collective bargaining unit at the Dunkin' Donuts Mid–Atlantic Distribution Facility in Swedesboro, New Jersey.

At the hearing on the issues raised by this petition and the answers thereto, all parties were afforded full opportunity to be heard, to examine and cross-examine witnesses, to present relevant evidence, and to argue on the evidence and the law. The Court heard final oral argument on this matter five weeks later. This Court has reviewed the extensive record in this case, including the transcripts of proceedings and other evidence before Administrative Law Judge William G. Kocol, and Judge Kocol's Opinion of April 20, 2000, detailing his findings that the respondents had committed substantial unfair labor practices surrounding union organizing activities and a certification election conducted September 19, 1998. The essential issue under section 10(j) is whether this Court should grant a temporary injunction compelling the respondents to take steps to ameliorate their alleged unfair labor practices pending final determination by the NLRB upon review of ALJ Kocol's decision.

Respondents urge this Court to deny the request for a 10(j) injunction. As a preliminary matter, respondent Dunkin' Donuts denies knowledge of or responsibility for any unfair labor practices carried out by Aldworth, claiming that Aldworth at all times was the sole employer of the workers involved in this case. The Court accordingly must decide whether Aldworth and Dunkin' Donuts are "joint employers" for the purposes of the Act. For reasons discussed in Part II below, the Court finds that the respondents are joint employers, and are jointly liable for any unfair labor practices committed.

Having determined that the respondents are joint employers, the Court must then determine whether the NLRB has satisfied the two-pronged test for 10(j) relief: (1) whether there is reasonable cause to believe the respondents engaged in unfair labor practices; and (2) whether the requested relief—which includes reinstating suspended and/or fired workers, setting aside the prior certification election, and the imposition of a mandatory bargaining order—is just and proper. As discussed below, the Court finds that the petitioner has satisfied both prongs, and will grant the requested injunctive relief.

## II. JOINT EMPLOYER ISSUE

█ The NLRB seeks to compel both Dunkin' Donuts and Aldworth to bargain with the union representing workers at the Dunkin' Donuts Mid–Atlantic Distribution facility in Swedesboro, NJ. The issue of whether Dunkin' Donuts and Aldworth are "joint" employers of these workers is a significant one. Where two employers are found to occupy joint employer status,

both are required to bargain with a union representing the employees, and thus the joint employer determination governs whether an injunctive order from this Court applies to one or both of the respondents. *See Capitol EMI Music,* 311 NLRB 997, 1993 WL 195860 (1993), *enforced,* 23 F.3d 399, 1994 WL 198838 (4th Cir.1994). In joint employer cases, the inquiry focuses on determining which of the two, or whether both, of the employers control the labor relations of a unit of employees. *NLRB v. Condenser Corp. of America,* 128 F.2d 67 (3d Cir.1942). Where it can be shown that two entities share or co-determine essential matters of employment, both are joint employers. *See NLRB v. Browning–Ferris Indus.,* 691 F.2d 1117, 1124 (3d Cir.1982). With these principles in mind, the Court turns to consider the facts relevant to the joint employer issue.

### A. *The Respondents' Functions*

Respondent Dunkin' Donuts is a nonprofit purchasing and delivery cooperative that operates for the benefit of the individual owners and franchisees of Dunkin' Donuts retail stores. The owners of the retail stores pay a fee to use the services provided by Dunkin' Donuts, and the owners of the member retail shops collectively are the owners of Dunkin' Donuts. (ALJ Dec. at 5.)[1] There are about 970 retail members in about 1,200–1,400 retail stores. (*Id.*) Dunkin' Donuts maintains a distribution facility located in Swedesboro, NJ, where it stores, sells, and trucks goods and products to retail outlets in the Mid Atlantic region. (*Id.* at 6) The Swedesboro facility ships a total of about 4.2 million pounds of product annually. (*Id.* at 5.)

Dunkin' Donuts has personnel both in Massachusetts (its home state) and at the Swedesboro facility. Craig Setter is the president of Dunkin' Donuts. Michael Shive is the distribution facility manager for the Swedesboro plant, and is responsible for the warehousing functions of facility maintenance, building and grounds maintenance, and slot location. He creates, maintains, and manages the budget covering all warehouse and transportation functions. (*Id.*) Reporting to Shive are Thomas Knoble, the transportation manager, and Warren Engard, the warehouse supervisor. (*Id.*)

Dunkin' Donuts also employs customer service representatives ("CSRs") at the Swedesboro facility. These employees take weekly orders from the retail shops, and make necessary adjustments to drivers' delivery routes. For example, an unusually large order may require placing the store on another delivery route or scheduling an additional delivery. Once the CSR makes the adjustment, he or she then prints the manifests used by the drivers. (*Id.*)

Respondent Aldworth is a company in the business of leasing drivers, warehouse workers, and other relevant employees to firms whose business involves transporting goods. Kevin Roy, executive vice-president, and Wayne Kundrat, director of operations, work out of Aldworth's main office in Lynnefield, MA. Aldworth employs about 1,500 employees in about 24 states, and provides services to about 25 businesses, including Dunkin' Donuts. (*Id.*) At the Swedesboro facility, Aldworth employs about 130–140 employees, consisting of about 63 drivers, 40–45 warehouse employees, and 30–40 driver helpers. (*Id.* at 6.) Aldworth also employs a number of supervisors at the facility.

The duties of the employees at the facility mainly involve packing stock and delivering merchandise to individual Dunkin'

---

1. The Court will mainly cite to the comprehensive 156 page single-spaced opinion of Administrative Law Judge William G. Kocol dated April 20, 2000, detailing his findings of fact and conclusions of law following hearings and post-hearing motions in the underlying matter taking place between June 21, 1999 and January 4, 2000, as follows: (ALJ Dec. at ——.) Where necessary, references to the transcript and exhibits will be as follows: transcript (Tr.); General Counsel's exhibits (GCX); Respondent's exhibits (RX).

Donuts Shops. Warehouse workers select merchandise from stock according to the invoices supplied by the CSRs, and load the stock onto waiting trucks. Truck drivers then deliver the merchandise to the retail stores where, with the assistance of drivers' helpers, they unload and store the merchandise. (*Id.*)

### B. Uniforms

Aldworth provides the uniforms worn by the employees. The standard uniform is comprised of a tan long-sleeved shirt with a Dunkin' Donuts logo patch, and the words "contractor for" appearing in small type above the logo. (*Id.*) Workers are also issued T-shirts for wear in the summer months. These T-shirts simply bear the name Dunkin' Donuts. (*Id.*) The trailers used by Aldworth drivers to ship the merchandise to the retail shops are owned by Dunkin' Donuts and bear pictures of doughnuts and other Dunkin' Donuts products. The costs for the uniforms are passed through Aldworth and onto Dunkin' Donuts as part of their costplus contract, by which Dunkin' Donuts repays Aldworth for the costs of the workers' labor, plus an additional fee for Aldworth's services. The minimal size of the "contractor for" language, and the overall appearance of the uniforms, allows the inference that both the public and the employees had grounds to believe that the workers are jointly employed by Aldworth and Dunkin' Donuts.

### C. Employees' Wages & Benefits

Under the cost plus arrangement, in return for Aldworth's provision of personnel to staff the warehouse and deliver goods, Dunkin' Donuts pays Aldworth for the employees' wages and services, plus an additional fee for Aldworth's services. Aldworth pays the employees wages and benefits, maintains workers' compensation insurance, withholds taxes, and keeps records. (*Id.* at 7.)

Under this contract, Aldworth nominally makes hiring and firing decisions, but it is clear that Dunkin' Donuts, not Aldworth, controls the workers' wages. By setting limits on the extent to which it will reimburse Aldworth for wages paid, Dunkin' Donuts effectively dictates what the workers' pay will be. (*Id.*)

The structure of the employees' compensation plan also reflects the extent of Dunkin' Donuts' involvement. Dunkin' Donuts personnel actually generate the payroll records, and Dunkin' managers Shive or Knoble authorize the payroll. (*Id.* at 11.) Among the benefits provided to Aldworth employees is a 401(k) plan which is the same plan provided to Dunkin' employees. The plan identifies Dunkin' Donuts as the administrator of the plan, and lists Dunkin' Donuts as "your employer". Questions that Aldworth employees have regarding the 401(k) are answered by Dunkin' Donuts personnel.

Based on the foregoing, the record establishes that Dunkin' Donuts had *de facto* power to set Aldworth employees' wages and benefits. This finding adds to Dunkin' Donuts status as a joint employer.

### D. Dunkin' Donuts' Hiring/Firing/Discipline Power at the Facility

In addition to involvement in setting employees' wages and schedules, Dunkin' Donuts also exercised control over multiple hiring, firing, and disciplinary decisions made at the facility. For example, ALJ Kocol found that Dunkin' Donuts directors and Aldworth made what seemed to be a joint decision to hire Daniel Hoffman for the position of field supervisor. Hoffman had separate interviews with Dunkin' Donuts facility directors Shive and Knoble and then-Dunkin' Donuts president Phil Reeves before he was given the job. (*Id.* at 9.)

Dunkin' Donuts managers frequently had a hand in hiring drivers. The record shows that Knoble, Dunkin' Donuts transportation director at the facility, occasionally personally administered road tests

taken by driver applicants. On several occasions Knoble told applicants that they would be hired so long as they passed a drug test. On other occasions, Knoble expressed displeasure with an applicant and that applicant would not be hired. (*Id.* at 10.)

Dunkin' Donuts supervisors also played a role in hiring warehouse workers. After Frank Fisher, a previous Aldworth operations manager, finished interviewing applicants, he would routinely bring them to Dunkin' Donuts warehouse supervisor Warren Engard, who asked the applicant questions and had them perform a mock inventory selection process. Afterwards, Fisher would ask Engard what he thought of the applicant and Engard would give his opinion. Engard's involvement is tempered somewhat by evidence that Fisher did not always agree with Engard and occasionally hired an employee over Engard's objection. (*Id.*)

Dunkin' Donuts' influence over personnel decisions is also evident in employee Hoffman's termination from the position of field supervisor. According to Hoffman, in May 1998 he was summoned to a meeting with Dunkin' Donuts managers Knoble and Shive, and Craig Setter, who had replaced Reeves as president as president of Dunkin' Donuts. Setter informed Hoffman that the Dunkin' Donuts board had voted four to three to abolish Hoffman's position. Hoffman reminded them that he had been promised that he would be allowed to return to work as a driver if the position was abolished, and he subsequently went back to work in that capacity. There is no evidence that Hoffman dealt with any Aldworth supervisor concerning his return to the position of driver. (*Id.* at 11.)

Finally, the record includes evidence that Dunkin' Donuts was involved in disciplining and terminating employees at the facility. Fisher admitted that he regularly consulted with Dunkin' Donuts managers concerning termination decisions. Furthermore, the record contains evidence that Engard personally fired at least one employee. (*Id.*) Hoffman testified that Knoble frequently told him that employees should receive unpaid days off for infractions, and that he always carried out these instructions. (Tr. 800, 802–03, 861; GCX–40.) Knoble disciplined Leo for bad driving, and suspended employee Puig. (Tr. 567, 661–63.) Shive sent warehouseman Ron Matczak home when he refused to abide by Dunkin's dress code by wearing shorts. (ALJ Dec. at 25.; Tr. 1190.) Knoble also personally completed forms triggering discipline based on complaints by customers, retail outlets, or other driver misconduct. (Tr. 3000; GCX–58, 58A & B; ALJ Dec. at 25–27, 29–31).[2]

The record thus establishes that Knoble and other Dunkin' managers were deeply involved in personnel matters at the Swedesboro facility. Based on this evidence, the Court finds that Dunkin' Donuts played a crucial role in hiring and firing, and a significant role in disciplining, Aldworth employees.

### E. Dunkin' Donuts' Scheduling Responsibilities

The record also shows that Dunkin' Donuts plays an active role in the creation of delivery routes, the assignment of drivers to those routes, and the creation of shift times and shift sequences at the facility. For example, when a route became open after driver Leo Leo was fired, driver Farnsworth asked Knoble whether he could switch to Leo's route. Knoble told Farnsworth that he could have the route so long as he could finish the route as fast as another driver who wanted it. No Aldworth supervisors were involved in these

---

2. The ALJ found that 75% of all discipline of the Aldworth employees imposed at the facility occurred with no Dunkin' Donuts involvement. Nevertheless, for the purposes of this 10(j) petition, all this Court need do is determine whether Dunkin's role in imposing discipline is significant. This Court finds that involvement in 25% of the disciplinary cases is a significant proportion.

discussions. (*Id.* at 13.) Generally, when a driver wanted his route or schedule adjusted, they dealt directly with Dunkin' manager Knoble. Knoble also had apparent authority to adjust the start or delivery times on routes, assigned particular tractor rigs to drivers, and gave them special assignments as business demands required. (*Id.* at 13–14.) These facts show that Dunkin' Donuts had a direct and significant role in determining Aldworth employees' day to day schedule and work assignments.

### F. *Interpretation of Government Regulations*

Under relevant federal DOT regulations, Dunkin' Donuts is listed as the carrier or employer at the facility. (*Id.* at 8.) Dunkin' Donuts maintains the drivers' annual reviews, drivers' logs, and other data showing compliance with DOT rules and regulations. Dunkin' manager Knoble had the final word on how the DOT regulations were to be interpreted, and it was Knoble who worked with the drivers to figure out how to complete deliveries in the event that an hours-on-the-road regulation mandated that the driver return to the facility before his route was completed. (*Id.* at 9.) The fact that Dunkin' Donuts had the final say in keeping the drivers in compliance with the DOT regulations adds to Dunkin's status as joint employer.

### G. *Analysis*

■ The respondents' arguments that they are not joint-employers are belied by copious record evidence showing that Dunkin' Donuts had a pervasive and substantial role in setting the workers' responsibilities and benefits, and controlled many day-to-day aspects of their employment. For instance, Dunkin' Donuts in large part determined the wages and benefits of Ald-

worth employees, and it applied its own 401(k) plan to Aldworth employees. Further evidence of Dunkin' Donuts' involvement is seen in Dunkin' manager Knoble's significant role in deciding which driver applicants were hired, fired, and disciplined, as well as Knoble's direct involvement in assigning work and equipment to the employees.

The test for determining joint employer status, as expressed in the Supreme Court decision of *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 11 L.Ed.2d 849 (1963), is whether evidence shows that the putative employers share or co-determine those matters governing essential terms and conditions of employment. If there is such a showing, then they constitute joint employers within the meaning of the NLRA. *NLRB v. Browning–Ferris Indus. of Pennsylvania Inc.*, 691 F.2d 1117, 1124 (3d Cir.1982). As discussed above, the NLRB has pointed to abundant evidence showing that Dunkin' Donuts shared or codetermined a large number of the matters governing the essential terms and conditions of Aldworth's employees work at the facility. Based on this evidence, the Court concludes that Dunkin' Donuts and Aldworth were "joint employers" of the employees at the facility within the meaning of the NLRA. Accordingly, any 10(j) injunctive order from this Court will apply to both respondents.[3]

### III. *BACKGROUND OF UNION ORGANIZING EFFORT*

In February 1998, Peg Michalowski, an organizer for United Food and Commercial Workers Union Local 1360 a/w United Food and Commercial Workers International Union, AFL–CIO ("the union"), approached her nephew, Kenneth Mitchell, about the possibility of organizing employees at the facility. Mitchell gave Micha-

---

**3.** By letter dated November 17, 2000, counsel for Aldworth informed the Court that Dunkin' Donuts is terminating its agreement to lease Aldworth personnel for the Swedesboro facility effective January 1, 2001. The NLRB and the respondents have not argued the effect, if any, of Dunkin' Donuts decision to terminate Aldworth's contract, nor does the Court have information on the parties' respective motives or the post January 1, 2001 status of these personnel.

lowski a list of employees and their telephone numbers, and the union used the list to obtain the employees' addresses. (Tr. 141, 1216.)

From early March through early September 1998, Michalowski and other union organizers began visiting employees at their homes. During these visits, organizers discussed the collective bargaining process, and explained that by signing the provided election cards, the employees were authorizing the union to represent them for the purposes of collective bargaining. The organizers explained that once the union obtained a majority of the cards signed, they would file a petition with the NLRB to have the collective bargaining unit certified. (ALJ Dec. at 37.)

As the organizing effort picked up steam, several of the facility's drivers and warehouse employees began actively organizing from the inside. Among the most active employees in this effort were drivers Mitchell, Leo, and McCorry. Cards were signed by drivers en route to Dunkin' Donuts stores and during union meetings with employees on Saturdays. As described more fully below, Aldworth responded to the organizing activity by holding a series of meetings with employees about the union beginning in April 1998.

By letter dated June 16, 1998, the Union formally notified Aldworth of an organizing effort in a unit comprised of truckdrivers, helpers, and warehouse employees. The letter also protested alleged unfair labor practices committed by Aldworth. By letter dated June 18, Aldworth denied committing any unfair labor practices.

On July 28, 1998, the Union filed a petition for an election indicating that it had the support of a majority of workers within a proposed bargaining unit that included drivers' helpers. This petition was withdrawn and the union then filed two new petitions on August 11, 1998. One sought to represent the drivers and warehouse workers and the second to represent the helpers. The second petition was later withdrawn.

On August 12, 1998, Aldworth and the Union entered into a Stipulated Election Agreement that provided for an election in the following unit of employees:

Included: Regular and full-time drivers, warehouse employees, yard jockey(s), maintenance employee(s) and warehouse trainees.

Excluded: All other employees, guards and supervisors as defined by the Act.

(*Id.* at 37–38.) This class excluded drivers' helpers as an accommodation to Aldworth's objection to their inclusion. An election was conducted on September 19, 1998, and the union lost by a vote of 45 to 48 with one challenged ballot. The union timely filed objections to the conduct of the election and filed a complaint with the NLRB in April 1999.

The Board took up the union's complaint, and alleged that the pre-election meetings were designed to intimidate the employees and to dissuade them from electing the union, thus constituting unfair labor practices within the meaning of section 8(a)(1) of the Act. The Board also alleges that respondents disciplined and/or fired several employees because of their union affiliation in violation of section 8(a)(3) of the Act. Finally, the Board alleges that respondents unlawfully refused to bargain with the employees' duly elected collective bargaining representatives, in violation of section 8(a)(5) of the Act.

Hearings on this matter took place before an NLRB administrative law judge in the Summer and Fall of 1999. After the conclusion of these proceedings, on April 20, 2000, Administrative Law Judge William G. Kocol issued an Opinion thoroughly detailing his findings of fact and conclusions of law. Judge Kocol ordered, among other things, that the election narrowly rejecting unionization be set aside, that respondents must reinstate several employees unlawfully terminated, and that respondents must bargain with the union as the employees' collective bargaining representative. Enforcement of Judge

Kocol's decision awaits a determination by the full NLRB.

## IV. *DISCUSSION*

### A. *Scope of Review Under Section 10(j) of the NLRA*

With the passage of the Taft Hartley Amendments of 1947, Congress enacted Section 10(j) of the Act, which provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

■ Section 10(j) provides that after issuance of a complaint alleging a violation of any section of the Act, the Board can petition an appropriate district court for temporary equitable relief. "[I]nterim relief may be granted without the showing of irreparable harm and a likelihood of success on the merits...." *Kobell v. Suburban Lines,* 731 F.2d 1076, 1078 (3d Cir. 1984). A district court must make two determinations when deciding whether interim relief should be ordered: (1) whether there is "reasonable cause" to believe an unfair labor practice has occurred; and (2) whether the relief sought is "just and proper." *Id.*

■ The Third Circuit has developed a two-part test to determine whether reasonable cause has been established. In order to grant injunctive relief, the district court must find the legal theory implicit or explicit in the Regional Director's argument to be "substantial and not frivolous." *Suburban Lines,* 731 F.2d at 1084. Additionally, viewing the facts in the light most favorable to the Board, the court must find sufficient evidence to support any proffered theory of the Regional Director. *Id.* The Regional Director faces a "low threshold of proof" in establishing reasonable cause. *Eisenberg v. Wellington Hall Nursing Home,* 651 F.2d 902, 905 (3d Cir. 1981). The court is not required to judge the merits of the underlying unfair labor practice. *See, Pascarell v. Vibra Screw, Inc.,* 904 F.2d 874, 882 (3d Cir.1990).

■ A 10(j) injunction is just and proper "when the nature of the alleged unfair labor practices [is] likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation." *Vibra Screw,* 904 F.2d at 878. Congress designed 10(j) to allow the Board to protect the effectiveness of its remedial power in cases where the Board and the courts are both convinced "that the failure to grant such relief might dissipate the effective exercise of such power." *Suburban Lines,* 731 F.2d at 1091. Close attention must be paid to whether refusing to grant relief will affect the public interest "in the integrity of the collective bargaining process." *Wellington Hall,* 651 F.2d at 907. If this public interest will be adversely affected, 10(j) injunctive relief is just and proper. *Id.*

### B. *Whether Reasonable Cause Exists to Believe That An Unfair Labor Practice Has Occurred*

#### 1. *Alleged Section 8(a)(1) Violations*

Under section 8(a)(1) of the Act, "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section 7" of the Act[4] is an unfair labor practice. 29

---

4. Section 7 provides:

> Employees shall have the right to self-organization, to form, join, or assist labor orga-

U.S.C. § 158(a)(1). The Board alleges that respondents jointly interfered with and/or coerced their employees into rejecting unionization at a series of meetings conducted by Aldworth executive vice-president Kevin Roy, and by otherwise attempting to influence and coerce the employees. The Board also alleges that respondents intimidated employees into voting against the union during individual meetings with employees, and by disciplining and/or firing key union-affiliated employees. ALJ Kocol's decision details abundant unlawful antiunion activity by respondents. Because the present 10(j) motion does not require evaluation of the merits of the underlying petition, the Court will not discuss every instance of alleged misconduct detailed by ALJ Kocol. Instead, the Court will limit its discussion to several incidents that are representative of the overall atmosphere at the facility in the months leading up to the union election in September 1998, and which show that reasonable cause exists to issue a 10(j) injunction in this case.

### a. *Anti–Union Group Meetings*

The Administrative Law Judge found that respondents violated section 8(a)(1) by scheduling an extraordinary sequence of labor/management meetings between April and September 1998, the sole purpose of which appears to have been to dissuade the employees from unionizing. For reasons now discussed, the Court finds reasonable cause to believe that much of the substance of the discussions at these meetings violated section 8(a)(1) of the Act.

During these several meetings, Roy attempted to get to the bottom of what was driving the unionization effort at the facility. Roy solicited the employees' complaints and grievances, and promised to improve the overall working conditions in

order the discourage their support for the union. For example, during a meeting taking place over several hours on April 11, 1998, Roy asked the employees if there were any issues, other than wages and benefits, that he could discuss because it had come to his attention that the union was around. (ALJ Dec. at 40.) Roy and Aldworth manager Fisher took down the employees' complaints and Roy promised to address them within 30 days. (*Id.*)

Roy's promises to respond to employee complaints would prove to be a common theme. Among the promises Roy made to employees at a meeting on June 27, 1998 were wage increases, new work attire, and an improved benefit package. (*Id.* at 53:5–10.) At a meeting on August 29, 1998, Roy promised improvements in communications between employees and management. He also stated that he planned to remove an unpopular supervisor, Knoble, and would hire new supervisors in order to satisfy the employees' complaints. (*Id.* at 60:30–61:10.) This promise to get rid of unpopular supervisors and hire new ones was repeated at meetings on September 1 & 3, 1998. (*Id.* at 63.) At the September 3rd meeting, Roy promised to address the employees' concerns about the health plan provided by Aldworth, such as a lack of available doctors and overlarge co-pays. (*Id.* at 67.)

There is ample cause to believe that Aldworth's repeated solicitation of employees' complaints and promises to adjust grievances was a transparent attempt to quickly eliminate prounion sentiment at the facility. It is well established that the solicitation of employee grievances and promised to adjust the grievance is unlawful if done in an effort to stifle union activity. *Hospital Shared Services*, 330 NLRB No. 40 (1999); *Reliance Electric*

---

nizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157.

Co., 191 NLRB 44, 46 (1971), *enforced*, 457 F.2d 503 (6th Cir.1972). Here, there is evidence that the solicitation of grievances was directly tied to the on-going unionization effort, and that some of the employees' grievances were addressed by management in an effort to undermine the union's organizing campaign immediately prior to the election. (ALJ Dec. at 42.) When undertaken in response to an organizing effort, solicitation and adjustment of grievances is a violation of section 8(a)(1).

In addition to unlawfully soliciting employees' complaints, there is ample cause to believe that the meetings also had the effect of intimidating the employees into voting against unionization. A forceful example of the coercive nature of the meetings called by Aldworth is seen in Roy's repeated use of the "blank sheet of paper" metaphor. At the meeting held on April 11, 1998, Roy held up a blank sheet of paper and told the employees that a blank sheet would be where they would start during the bargaining process if the union were selected, *i.e.*, with nothing. (*Id.* at 39.) This metaphor was repeated at meetings held on June 27, and September 8, 1998. (*Id.* at 49, 70–71.) Roy's use of this metaphor provides reasonable cause to believe that the tone of these meetings was coercive. The blank sheet of paper—signifying a total loss of benefits—sent the message that the employees stood to *lose* benefits if they voted to unionize, and that they would be punished if they voted in favor of collective bargaining. This is different than telling employees that at the *end* of collective bargaining wages could go up or down. Based on record evidence showing that Aldworth told employees that they would lose their benefits at the outset, the Court finds additional cause to believe that respondents violated section 8(a)(1).

Another example of the coercive nature of the meetings is seen in Roy's statement to the effect that most employees would lose their jobs if they unionized. At a meeting conducted on August 29, 1998,

Roy told the story of how Aldworth originally obtained the contract with Dunkin' Donuts. Roy stated that the employees of the former contractor had unionized and that Dunkin' Donuts had terminated its relationship with the contractor because of the increased costs associated with the collective bargaining agreement negotiated between the contractor and the Teamsters. (*Id.* at 59.) This story plainly was intended to imply that Dunkin' could and would terminate the contract with Aldworth if the employees unionized. Without the Dunkin' Donuts contract, the bulk of the employees would lose their jobs. Accordingly, Roy's telling of a story concerning Dunkin' Donuts' past termination of a contract because of unionization constitutes evidence of a veiled threat that the employees would lose their jobs if they supported the union. Threats of job loss were repeated at a meeting held on September 3, 1998. (*Id.* at 68:20–25.) This evidence of threatened job loss provides additional support for finding that respondents violated section 8(a)(1).

### b. *Individual Conversations with Employees*

In addition to the general meetings orchestrated by Roy, the record also demonstrates that several individual conversations took place between supervisors and employees that were violative of section 8(a)(1). For instance, in mid-August Aldworth Supervisor David Mann told warehouse employee Kenneth Mitchell that if for any reason Dunkin' Donuts canceled the contract with Aldworth, Dunkin' was ready to bring in people who could take over the facility and thereby avoid a shutdown. This statement came in the midst of the union campaign and was made to Mitchell, an open supporter of the union. (*Id.* at 91.) This statement could reasonably be interpreted as threatening that Dunkin' Donuts might cancel its contract with Aldworth if the union prevailed, and that the employees would then be faced with losing their jobs. The record also shows that Aldworth managers unlawfully

required union supporters to remove pro-union T-shirts (*id.* at 92), and that on one occasion Roy pointed to a pro-union pin on an employee's shirt and said "that's one of the reasons why you will not be working here." (*id.* at 93).

To briefly summarize, the record includes evidence that the unusual series of meetings called by Roy had the effect of unlawfully undermining unionization efforts. There is also evidence of individual conversations with employees that tended to unlawfully intimidate or coerce workers into rejecting unionization. Based on this record evidence, the Court concludes that there is reasonable cause to believe that unfair labor practices occurred within the meaning of section 8(a)(1) of the Act.

### 2. *Alleged Section 8(a)(3) Violations*

The Board also alleges that respondents violated section 8(a)(3) of the Act by firing or otherwise disciplining employees. Section 8(a)(3) provides that it shall be an unlawful labor practice for an employer to discharge or otherwise discriminate against an employee in retaliation for the employee's union activity. 29 U.S.C. § 158(a)(3).

 The burden shifting standard for assessing allegations that an employer has violated section 8(a)(3) is well settled. Under this standard, the employee must first make out a prima facie case of discrimination due to union activity. Among the factors to be considered in determining whether an employee has stated a prima facie case of discrimination are (1) the employee's union activity, (2) the employer's knowledge of the employee's union activity, and (3) the employer's hostility to the union activity. *Champion Parts Rebuilders v. NLRB,* 717 F.2d 845, 853 (3d Cir.1983); *NLRB v. Rich's Precision Foundry,* 667 F.2d 613, 626 (7th Cir.1981). Both the employer's knowledge of the employee's union activity and the employer's discriminatory motive may be inferred from circumstantial evidence. *Abbey's Transportation Services, Inc. v. NLRB,* 837 F.2d 575, 579–580 (2d Cir.1988); *NLRB v. Link–Belt Co.,* 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368 (1941). Once it has been shown that opposition to union activity was a motivating factor in the employer's decision to discharge or take adverse action against an employee, the employer will be found to have violated the Act unless the employer demonstrates, as an affirmative defense, that it would have taken the same action even absent the individual's union activities. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401–402, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

Of course, for the purposes of the present injunction petition this Court does not decide the 8(a)(3) allegations on the merits. The Board has a "relatively insubstantial" burden of proof, and this Court need only find reasonable cause to believe that there was a discriminatory motive behind the discharge or discipline. *Kobell,* 731 F.2d at 1084; *Eisenberg v. Wellington Hall Nursing Home,* 651 F.2d 902, 906 (1981). Because the Board has requested reinstatement of all discharged employees, the Court will address each disciplinary action in turn.

#### a. *Leo Leo's Termination*

 Driver Leo Leo was active in the organizing effort and in June was seen by Aldworth Supervisor Kearney wearing a union pin. (*Id.* at 100.) Later that same month, Leo had a conversation with another Aldworth supervisor concerning whether a union was needed at the facility. (*Id.*) These facts supply reason to believe that respondents knew of Leo's union affiliation, and there is ample factual ground throughout this record to find good cause to believe that respondents were hostile towards union activity.

Leo was fired for tardiness on June 24, 1998, purportedly for showing up late to work on June 21, 1998. (*Id.* at 101.) Leo was terminated despite the fact that other employees had records as bad as or worse than Leo's. (*Id.* at 106.) Judge Kocol

found that Aldworth gave shifting and incredible explanations for Leo's firing, and that Roy at one meeting essentially stated that Leo's firing came on account of his union activity. (*Id.* at 106.) Judge Kocol concluded that respondents failed to show that they would have fired Leo notwithstanding his union involvement. (*Id.* at 107.) This Court concludes that Judge Kocol's findings are based on creditable evidence and that this evidence provides sufficient reason to believe that Leo was fired in violation of section 8(a)(3).

### b. *William McCorry's Suspension*

■ The Board also alleges that respondents unlawfully suspended driver William McCorry. McCorry was one of the lead organizers in the union campaign, and had discussions with Aldworth manager Fisher about the need for a union. (*Id.* at 107.) These facts supply reason to believe that respondents knew of McCorry's union affiliation, and it has been established that the respondents were hostile towards union activity.

McCorry was given a five day suspension on June 29, 1998, purportedly for stealing company time after an unknown Aldworth agent saw him sitting stationary in his truck for over an hour after making a delivery. (*Id.* at 108.) The company refused to tell McCorry who this observer was, but Judge Kocol found that the evidence showed that the unknown agent was in fact Shive, the highest ranking Dunkin' Donuts manager at the facility. Shive apparently had never before conducted such surveillance of a route. Judge Kocol found that the only reason that respondents conducted such an unprecedented audit of McCorry's route by the ranking manager at the facility was McCorry's support of the union, and that respondents failed to show that they would have suspended him absent his support. This Court concludes that this evidence provides reason to believe that McCorry was suspended in violation of section 8(a)(3).

### c. *The "Freezer Incident" Suspensions*

■ On October 14, 1998, about one month after the election, warehouse employees Douglas King, Rob Moss, David Shipman, and Jesse Sellers were suspended for five days purportedly because of their theft of two cartons of orange juice that had been left in a room adjoining the facility's freezer area. As far as union activity, all of these employees were involved in the organizing effort, and management knew of their efforts either because of the employees' wearing of union T-shirts or because of their prounion remarks to managers. Additionally, Judge Kocol found that Roy and another Aldworth manager admitted that by October 13, 1998 they knew that all freezer employees were union supporters. (*Id.* at 120–21.)

To briefly summarize the incident, Aldworth supervisors discovered that someone had consumed two cartons of orange juice that had been placed in a break room adjoining the freezer area, and concluded that the culprits were the four employees listed above. (*Id.* at 122.) Dunkin' supervisor Shive questioned Shipman about the juice, who eventually admitted that he had consumed it. Employees King, Moss, and Sellers all denied consuming the juice, and there was no evidence that they did so. Nor is there any evidence that they had seen Shipman do so. Significantly, during King's interview concerning the incident, Aldworth supervisor Kennedy remarked that King spent "a lot of overtime" in the warehouse working on the union campaign and that King was a "big" union supporter. (*Id.* at 123–24.) Notwithstanding the lack of evidence against them, the abovelisted employees, as well as freezer employee Mitchell, a key union supporter apparently uninvolved in the freezer incident, all were suspended for five days and were transferred to work in the dry goods area of the warehouse. The reassignment is significant because freezer work apparently is generally preferred by workers over dry

goods detail because it allows for more work breaks.

Judge Kocol found that Aldworth was justified in disciplining Shipman, who admitted to consuming the juice. In contrast, he found that respondents unlawfully suspended King, Moss, Sellers, and Mitchell because there was no evidence connecting them with the freezer incident, and found that Aldworth's proffered reasons for disciplining these employees was pretextual. (*Id.* at 129–30.) Employee Sellers later received a related one-day suspension for insubordination that Judge Kocol also found unlawful. (*Id.* at 131–32.) This Court concludes that the record includes evidence which gives reasonable cause to believe that the discipline of Moss, King, Sellers, and Mitchell was motivated at least in part by anti-union animus, and that this discipline thus violates section 8(a)(3). This Court also concludes that the evidence of Kennedy's pointed remarks about King's union activity while examining him about the freezer incident provides reason to believe that these statements violated section 8(a)(1).

### d. *Selection Accuracy Program*

The Board also alleges that Aldworth implemented a new selection accuracy program ("SAP") as an unlawful retaliatory response to the employees' union activities, and that by adopting this policy Aldworth therefore violated section 8(a)(3). The record demonstrates that the new policy was not necessarily harsher towards employees or aimed at ensnaring union supporters. In his decision in this matter, Judge Kocol concluded that the new SAP had both positive and negative effects from the workers' standpoint.

The positive effect of this new SAP was that it reduced from six to two the number of points that an employee could accumulate in a one-week period.[5] It permitted

5. A brief overview of the workings of the SAP follows. The SAP is the method by which management compares the product selected (or "picked") by the warehouse employees for shipment to the retail stores against the manifests requesting those items. The employee's accuracy is measured by tallying the errors he or she commits in filling manifests. (Tr. at 1532, 3920.)

Under the SAP that existed before October 12, 1998, the number of selection errors made during a calendar week were compiled as a percentage of the total units picked during that week. The percentage was then assigned a number of points, and when a certain number of points were accumulated, progressively higher discipline was imposed. However, when errors were particularly low, the employee would be assigned a *negative* score for that week, thereby reducing his or her point total. Specifically the old SAP formula provides:

| Percent Range | Points |
|---|---|
| .000–015 | −2 |
| .016–030 | −1 |
| .031–046 | 0 |
| .047–061 | +1 |
| .062–076 | +2 |
| .077–091 | +3 |
| .092–106 | +4 |
| .107–121 | +5 |
| .122 and above | +6 |

(ALJ Dec. at 133.)

The point total was not permitted to go above twelve or below zero. While the employee was permitted to maintain his point total at a certain level without discipline, each increase in point value would result in progressive discipline. The discipline sequence was: (1) cautionary letter; (2) written warning; (3) 1–day suspension; (4) 3 day suspension; (5) 3–day suspension and final written warning; and (6) termination. (*Id.*) Under this system, when selection errors were low the numbers of points accumulated from previous weeks' errors were reduced, and the employee could thus avoid ever-advancing discipline.

This changed shortly after the certification election. On October 12, 1998 Aldworth implemented a revised SAP compressing the percentages and point values as follows:

| Percent Range | Point |
|---|---|
| .000–015 | −2 |
| .016–030 | −1 |
| .031–046 | 0 |
| .047–091 | +1 |
| .092 and above | +2 |

(*Id.* at 133.) Under this new SAP, points were capped at six, but employees no longer were permitted to maintain their point levels without discipline. Instead, under the new SAP, the number of accumulated points correlated directly with the discipline received as follows:

| Points | Discipline |
|---|---|
| 1 point | cautionary warning |

employees to build up to six credit points and capped the points at six instead of twelve. It also eliminated the suspensions under the old policy and substituted written warnings of escalating levels. The negative consequence of this new SAP was that employees could be more quickly subjected to discipline. Under the old policy it would take at least six weeks for an employee to be fired because the employee had to go through each of the disciplinary levels.

In contrast, under the new policy an employee could be subject to termination in as few as three weeks should the employee accumulate two points per week over three consecutive weeks. (*Id.* at 134.) To accumulate two points in a week under the new SAP program required an error rate of .092 or greater, which under the old SAP program would have resulted in four, five or six points for that week. Even so, it still required a minimum of six weeks of sub-par performance to be terminated in the old program, and only as few as three weeks to be terminated in the new SAP program.

Judge Kocol concluded that the new SAP was adopted as an effort by Aldworth to respond to the employees' complaints voiced during the several pre-certification election grievance solicitation meetings orchestrated by Roy. (*Id.* at 135.) Among the grievances Roy discovered was that warehouse employees felt that the old SAP was unfair. Judge Kocol concluded that the new SAP was implemented in response to these complaints, and that this action accordingly violated section 8(a)(3).

For the purposes of a 10(j) petition, this Court must determine whether there is good cause to believe that the new SAP violated 8(a)(3). There is some question as to whether this Court should simply adopt Judge Kocol's findings concerning the new SAP wholesale, or whether I should instead scrutinize Judge Kocol's decision in this matter under the deferential standard usually afforded to administrative agency decisions. While an Administrative Law Judge's findings constitute evidence supporting 10(j) relief, these findings are not sufficient by themselves to carry the Board's burden. In essence, Judge Kocol's opinion is evidence for the purposes of this 10(j) petition that must itself be based on evidence. Put another way, Judge Kocol has had far greater exposure to the facts involved in this case, and this Court will defer to his factual conclusions so long as his factual conclusions appear to be based on facts testified to in the proceedings before him. In instances where it appears that the Administrative Law Judge has erred on a conclusion of law, however, I will afford no deference.

The record shows that the Board and Judge Kocol improperly conflate the language of 8(a)(1) and 8(a)(3) as those sections relate to the adoption of new SAP. It is true that a work rule implemented in an effort to frustrate union organizing efforts is unlawful as a violation of section 8(a)(1). Judge Kocol seems to have borrowed principles from 8(a)(1) in discussing the new SAP, finding that "Aldworth implemented the new selection accuracy in fulfillment of its earlier unlawful solicitation of grievances and promise[s] to rectify them, all in an effort to undermine support for the union." (ALJ Dec. at 135:35–40.) This analysis misses the mark, however, for two reasons. First, whether the new SAP was adopted in an effort to prevent unionization is a question to be addressed under section 8(a)(1), which prohibits the improper solicitation and adjustment of grievances. Whether the new SAP may have tended to dissuade employees from voting for the union is not relevant for the purposes 8(a)(3) analysis. Section 8(a)(3) in-

| | | |
|---|---|---|
| 2 points | cautionary warning | |
| 3 points | 1st level written warning | |
| 4 points | 2nd level written warning, assigned additional training | |
| 5 points | 3rd level written warning, assigned additional training | |
| 6 points | subject to termination | |

(*Id.* at 134.)

quires into whether there is evidence of use of the "stick"—*i.e.*, retaliation—rather than the "carrot"—*i.e.*, grievance adjustment. Second, because of the new SAP was adopted *after* the contested certified election, it is manifest that the adoption of the new SAP came too late to influence the outcome of the election. Thus, despite the Board's allegation that the new SAP was adopted in response to workers' complaints about the old SAP, this change could not have affected the outcome of the election.

At any rate, the Court's inquiry here is whether there is good cause to believe that the new SAP violated the anti-retaliation provision of section 8(a)(3). For reasons discussed above, the Court finds that there is not good cause to believe that the adoption of the new SAP was motivated by retaliatory animus.

There also is not good cause to believe that the new SAP was enforced in a discriminatory way against pro-union workers, an action that would violate section 8(a)(3). As Judge Kocol noted in his decision in this matter, the Board did not originally allege that employees Sellers, Mitchell and King were fired in retaliation for their union activities, and he denied the Board's attempt on the last day of trial to amend its complaint to so allege. (ALJ Dec. at 143:10–19.) Neither is there any evidence that the new SAP was applied unevenly to openly the pro-union employees (Mitchell, King and Sellers) terminated under this policy. Moreover, there is no evidence in the record indicating that Aldworth was aware of union activity by the other employees terminated under the new

SAP (Allen, Bostic, Wolfer, Rosenburger, Everidge and Wallace). Based on a lack of record evidence showing a causal link between the enforcement of the new SAP and the pro-union status of employees terminated thereunder, the Board has failed its burden of showing good cause to believe that their terminations were retaliatory in violation of section 8(a)(3).

In sum, there is not good cause to believe that the new SAP was enacted for retaliatory purposes, nor is there good cause to believe that the new SAP was unevenly enforced against pro-union employees as a means of retaliation. The Court will accordingly deny the petition to the extent that it alleges violation of section 8(a)(3) in connection with the new SAP. The Court also will deny the Board's request under 8(a)(3) to reinstate employees fired pursuant to the new SAP.[6]

#### e. *Moss's Termination*

██ As discussed previously, employee Moss's support of the union was known to respondents. On November 19, 1998, Moss was involved in an incident where he stated that the manager's decision was "pretty f———up" and that the warehouse was "pretty f———up" after an Aldworth manager denied his request to work overtime the next day. Moss was subsequently terminated from employment. (*Id.* at 146.)

Judge Kocol found that although the language used by Moss was vulgar, there were many other incidents of record where other warehouse employees had used even more abusive language, but had not been terminated from employment.[7] Based on

---

6. Regardless of the Court's decision not to reinstate for a violation of section 8(a)(3), however, for reasons discussed below in Part IV.B.3.b, Aldworth's enactment of this policy violates section 8(a)(5), which prohibits an employer to unilaterally effect a material change in the terms and conditions of employment when under an obligation to collectively bargain, and prohibits termination or discipline resulting from such an unlawfully adopted policy.

7. For instance, around November 1999, the month in which Moss was fired, employee Mark Collins would occasionally call his supervisors Juan Rivera and Keith Cybulski "assholes" when he did not like what they had said to him. Collins on one occasion told Cybulski "f— you, pussy", and said that he would see Cybulski at the shopping mall where he would "beat Cybulski's ass." Collins apparently was not disciplined for such outbursts. (ALJ Dec. at 147.)

Aldworth's established hostility towards this unionization effort and the disparately severe discipline meted out to Moss, Judge Kocol concluded that by discharging Moss Aldworth violated section 8(a)(3). (*Id.* at 149.) This Court concludes that the above-detailed findings provide reason to believe that Moss's discharge violated section 8(a)(3).

### 3. *Alleged Section 8(a)(5) Violations*

The Court next considers whether respondents violated section 8(a)(5) of the Act. Section 8(a)(5) provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees".[8] 29 U.S.C. § 158(a)(5). The Board asserts two separate grounds for finding violation of 8(a)(5): First, that respondents unlawfully refused to bargain with the union, and second that respondents violated section 8(a)(5) by changing its selection accuracy program without bargaining with the union. The Court will address these arguments in turn.

### a. *Refusal To Bargain*

■ The Board first asserts that respondents unlawfully refused to bargain with the union as the employees' duly elected collective bargaining representative. Concerning this allegation Judge Kocol held that the respondents violated section 8(a)(5) by refusing to meet and bargain with the Union as the employees' duly designated collective bargaining agent. On June 27, 1998 the union advised respondents that the facility's employees had designated it as the collective bargaining representative, and requested recognition. On August 12, 1998, Aldworth and the union stipulated to the appropriateness of a specified bargaining unit identical to the one presented in the complaint in this

case.[9] (Pet. Br. at 47.) It was at Aldworth's insistence that the position "helpers" were excluded from the unit on the asserted ground that they were casual or temporary employees. (ALJ Dec. at 150.)

Although Aldworth later argued to Judge Kocol that this unit was inappropriate for collective bargaining purposes, he determined that Aldworth presented no evidence that the stipulated unit became inappropriate, and concluded that Aldworth was estopped from denying the validity of the bargaining unit. (*Id.*) The Court finds that this record evidence that Aldworth previously recognized the appropriateness of the definition of the unit provides reasonable cause to believe that respondents are now estopped from denying that the collective bargaining unit involved in this case is appropriate.

There is also reasonable cause to believe that a majority of the respondents' employees designated the union as their exclusive bargaining representative. As of July 29, 1998, there were 109 employees in the unit (GCX 18), and the union submitted 58 valid authorization cards. (ALJ Dec. at 150 & App. A.) Judge Kocol overruled Aldworth's various objections to the cards' validity and concluded that on July 28th the union had majority support among unit employees, namely, three more members than the 55 required for majority status.

Judge Kocol also determined that the union made a proper demand for recognition. By letter dated June 28, 1998, the union advised Aldworth that it represented a majority of the unit employees and requested recognition. (*Id.* at 151.) Aldworth declined to recognize the union by letter dated June 30, stating that it would not do so until a Board-conducted election established its majority status. (*Id.*)

---

8. Collective bargaining is defined in section 8(d) as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith". 29 U.S.C. § 158(d).

9. Included: Regular and full-time drivers, warehouse employees, yard jockey(s), maintenance employee(s) and warehouse trainees.
 Excluded: All other employees, guards and supervisors as defined by the Act.

Based on the unrefuted stipulation discussed above respondents are estopped from denying the appropriateness of the asserted bargaining unit at this juncture. Moreover, there is good cause to believe that the union was properly designated as the collective bargaining unit representative, and that it submitted an appropriate demand for recognition, and that respondents refused to bargain with the union in contravention of section 8(a)(5) of the Act. *See Hirsch v. Konig*, 895 F.Supp. 688, 694 (D.N.J.1995). This evidence provides good cause to believe that respondents violated section 8(a)(5) by refusing to bargain even after it appeared that the union had majority support among an appropriately formulated collective bargaining unit.

### b. *Selection Accuracy Program Changes*

■ The Board next alleges that the respondents violated the Act by changing the selection accuracy program ("SAP") discussed above in Part IV.B.2.d, without bargaining with the union, and by discharging certain employees pursuant to this policy. An employer violates section 8(a)(5) of the Act when it makes unilateral changes to the terms and conditions of employment while under an obligation to bargain. *Brockway Motor Trucks v. NLRB*, 582 F.2d 720, 725 (3d Cir.1978).

■ Here, Aldworth acted at its own risk when it decided to change a material term of the warehouse workers' employment, and may not claim ignorance of its duty to bargain. If the change made was one that should have been part of the bargaining process, then such change is violative of the Act. *Leeds & Northrup Co. v. NLRB*, 391 F.2d 874, 877 (3d Cir.1968). If the unlawfully adopted policy was a factor in the discharge of employees, then the discipline or discharge pursuant to that policy also violates section 8(a)(5), and employees demoted or terminated pursuant to such an unlawful policy must be restored to their previous status. *Great Western Produce, Inc.*, 299 NLRB 1004, 1005 (1990). *See also* 48A Am.Jur.2d *Labor and Labor Relations* § 3120 (1994) (citing *Great Western Produce* ).

The analysis of discipline allegedly done in violation of 8(a)(5) differs from the analysis of conduct that violates section 8(a)(3). In the case of section 8(a)(3) violations, unlawful conduct is subject to the burden shifting test discussed in Part IV.B.2. *See Wright Line*, 251 NLRB 1083, 1980 WL 12312 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981). That is, the discipline will be revoked unless the employer demonstrates, as an affirmative defense, that it would have taken the same action even absent the individual's union activities. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401–402, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Thus, in cases involving section 8(a)(3), the focus is on the employer's interference with the individual employee's section 7 rights.

■ In the case of an alleged section 8(a)(5) violation, on the other hand, no valid reason asserted will prevent the revocation of the unlawful rule and any discipline flowing from it. *Great Western Produce*, 299 NLRB at 1005. The 8(a)(3) burden shifting defense is unavailable because the focus of analysis under section 8(a)(5) is on the injury to the union's status as a bargaining representative. *Id.* (citing *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 429 fn. 15, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967)). When the employer refuses to bargain by unilaterally changing its employees terms and conditions of employment, the negative effect is upon the union's status as bargaining representative of the unit employees. *Id.* The union's status is further damaged by each additional application of the unlawfully changed term or condition of employment. Thus, the rule in cases where a violation of section 8(a)(5) has occurred is that if the employer's unlawfully imposed rules or policies were *a factor* in the discipline or discharge, then the discipline or discharge violates section 8(a)(5), and that employee will be restored to the *status quo ante*. *See Fibreboard Corp. v. NLRB*, 379 U.S. 203, 217, 85 S.Ct.

398, 13 L.Ed.2d 233 (1964). If, however, the unlawful policy or rule was not a factor in the discharge and the discharge was *independent* of the unlawful rule, then the employer will not be required to reinstate the terminated employee. *See Boland Marine & Mfg. Co. v. Intern. Broth. of Boilermakers Local 37,* 225 NLRB 824 (1976), *enforced,* 562 F.2d 1259 (5th Cir. 1977).

 Judge Kocol found that the respondents violated section 8(a)(5) when they unilaterally changed the SAP, an important term of warehouse employees' employment, while under an obligation to bargain with the union. (ALJ Dec. at 153.) Based on Judge Kocol's finding, and on the record evidence that the respondents were under an obligation to bargain at the time they made the switch to the new SAP, the Court concludes that there is reasonable cause to believe that Aldworth's implementation of the revised SAP violated section 8(a)(5).

The next issue is whether the new SAP was a factor in the terminations of employees Nelson, Sellers, Mitchell, King, Allen, Bostic, Wolfer, Rosenburger, Everidge and Wallace. If there is reasonable cause to believe that the new SAP was a factor in the discharge of these employees, and that they were not terminated because of independent considerations, then their discharge violated section 8(a)(5) and this Court will order reinstatement. As discussed above, it is irrelevant whether Aldworth would have fired these employees for reasons besides their SAP point accumulation. All that matters for 8(a)(5) analysis is whether the new SAP was a factor.[10]

Turning to the issue of whether the new SAP was a factor in the terminations of the above employees, the Court first considers whether the new SAP was a factor in the termination of employee Mitchell.[11] Mitchell began working under the new system without carrying over any points from the previous SAP. (ALJ Dec. at 138.) On November 21, he earned two points for his selection errors. The next week he earned two more points, and the following week he earned two more for a total of six. (*Id.* at 138–39.) On December 8, 1998 Mitchell spoke with supervisor Henderschott, who gave Mitchell a letter concerning his poor selection accuracy that informed him that was terminated for the points he had accumulated during the previous month. Curiously, Mitchell continued to work despite the letter until December 14, when supervisors Fisher and Kennedy called him at home to tell him that he was terminated on account of his SAP record. (Id. at 139.) The record thus provides ample cause to believe that Mitchell was terminated under the unlawfully adopted new SAP, and thus in violation of section 8(a)(5).

The record provides similar evidence concerning other discharges made pursuant to the revised SAP. Judge Kocol found that employees Nelson (*id.* at 137–38), Sellers (*id.* at 141–42), King (*id.* at 142), Allen (*id.* at 143), Bostic (*id.* at 144), Everidge and Wallace (*id.* at 145), all were terminated due to excess points calculated under the new SAP. Accordingly, there is reasonable cause to believe that the new

---

10. As explained above, because there is reasonable cause to believe that employees Nelson, Sellers, Mitchell, King, Allen, Bostic, Wolfer, Rosenburger, Everidge and Wallace were terminated pursuant to a rule that violated 8(a)(5), then it is unnecessary to consider whether Aldworth would have fired them for other reasons as well. Only if their termination was *independent* of the new SAP would their reinstatement be improper. Aldworth argues that employee Mitchell even without the new SAP in place, but there is ample

cause to believe that the new SAP was a factor in Mitchell's termination. Judge Kocol found that Mitchell was terminated after his supervisors tallied his selection accuracy errors under the new policy and found that his point total was such that it merited dismissal. (ALJ Dec. at 139.)

11. See footnote 6, supra, for more detailed discussion of the differences between the new and old SAP programs.

SAP was a factor in the terminations of all of the above employees, and their discharge consequently also violates section 8(a)(5).

Despite the fact that these terminations were actionable under both 8(a)(3) and 8(a)(5), Judge Kocol analyzed the discharges only applied only the analysis appropriate for 8(a)(3). Under this analysis, Judge Kocol concluded that Sellers, Mitchell, King, Allen, and Bostic were improperly discharged, but that Nelson, Everidge and Wallace would have discharged even under the old policy and thus their terminations did not violate 8(a)(3). If this Court were considering this workplace discipline only in the context of section 8(a)(3), it seems that only the terminations of Sellers, Mitchell, King, Allen, and Bostic would be reversed. Nevertheless, the Board in its 10(j) petition has requested invalidation of *all* discipline imposed under the rubric of the revised SAP. (Pet. at 25 ¶ 2(a).) Based on Judge Kocol's findings concerning how the new SAP violated section 8(a)(5), and based on record evidence showing that the new SAP was a factor in the discharge of the above-listed employees, the Court finds reasonable cause to believe that respondents violated section 8(a)(5) in discharging employees Sellers, Mitchell, King, Allen, Bostic, Nelson, Everidge and Wallace, and these employees will reinstated to their previous positions on an interim basis pending final disposition of this matter by the full board.

### 4. *Imposition of Bargaining Order*

 The next concern is whether the above detailed evidence of unfair labor practices under sections 8(a)(1), 8(a)(3) and 8(a)(5) of the act warrants imposition of a bargaining order. The Supreme Court has held that the imposition of a bargaining order is appropriate in both (1) exceptional and rare cases marked by unfair labor practices so outrageous that traditional remedies cannot erase their coercive effect, thus making a fair election impossible, and (2) cases marked by less pervasive unfair practices which nonetheless have the tendency to undermine majority strength and impede the election process. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614–15, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). If the Board determines that there is only a slight possibility of erasing the effects of those unfair labor practices and ensuring a fair election through traditional remedies, then a bargaining order is appropriate. *Id.* In making this determination, the Board may take into account the extensiveness of the employer's unfair labor practices in terms of their past effect on the election and the likelihood of their recurrence in the future. *Id.*

 In this case, there is reasonable cause to believe that the respondents' conduct tended to undermine the union's majority strength and impermissibly impede the election process. The record contains abundant evidence providing reasonable cause to believe that unfair labor practices occurred between April and September, 1998, both before and after the election. There is evidence that respondents impermissibly undermined the union organizing effort with a concentrated and sustained effort to discover the basis of the employees' complaints and grievances that led them to embrace the union, and that the respondents tried to adjust those grievances in order to thwart the organizing effort. Some of the grievances were adjusted before the election, and some changes, such as a revised selection accuracy program, were implemented while the respondents were under an obligation to bargain with the union.

It is likely, in this Court's view, that the three vote margin against unionization in the September 1998 certification election was the product of respondents' unfair labor practices. Where the ballots reflected 45 votes for the union and 48 votes against, it is probable that the defeat of the union was caused by these unfair labor practices. A shift of just two votes to the union would constitute a majority, 47–46. The likelihood that at least two employees shifted

from pro-certification to defeat the union's efforts is rather substantial, given the prolonged and intense nature of respondents' many interferences with collective bargaining rights, including the pre-election termination and suspensions of union supporters.

Based on Judge Kocol's findings and the entire record before the Court, there is reasonable cause to believe that respondents' course of conduct included a wide and sustained range of unfair labor practices, including threats of discharge, threats of plant closure, threats of stricter working conditions, and threats of loss of benefits. There is reasonable cause to believe that the extent and pervasiveness of these threats make it likely that they will have a lasting and negative effect upon a future election.

There is also reasonable cause to believe that the suspensions and discharges described above will have effects not erasable short of a mandatory bargaining order. The record includes evidence that respondents unlawfully discharged employees Leo and McCorry, and unlawfully suspended and transferred several pro-union employees after the freezer incident. Respondents also terminated several employees pursuant to the revised SAP program, which program this Court has found cause to believe was unlawfully implemented as a way to subdue the pro-union movement in the facility. Based on the number and severity of these disciplinary measures, there is certainly cause to believe that this pattern of suspensions, transfers, and terminations will linger in the minds of employees long enough to prejudice the outcome of any future election process. The necessity of a bargaining order is further strengthened by the fact that there is reason to believe that high ranking managers Roy, Shive and Kundrat all committed unfair practices, and are still working for respondents, thus adding to the likelihood of worker intimidation.

Aldworth argues that a bargaining order is not appropriate in this case for several reasons. First, Aldworth contends that turnover among its employees lessens the need for a bargaining order. This argument fails, however, because the NLRB consistently has stated that it does not take turnover into account when determining whether to impose a bargaining order. Rather, the Board assesses the need for such an order as of the time the unfair labor practices were committed. *Salt Lake Division, a Division of Waste Management of Utah, Inc.*, 310 NLRB 883, 1992 WL 465255 (1993); *Salvation Army Residence*, 293 NLRB 944, 945 (1989), *enforced*, 923 F.2d 846 (2d Cir.1990). To do otherwise might allow an employer to benefit from the effects of its own unlawful conduct *causing* the turnover, and could result in the perverse effect of encouraging such conduct. *Overnite Transportation Co.*, 329 NLRB No. 91, 1999 WL 1036568, Slip Op. at 5 (Nov. 10, 1999). Moreover, even assuming that turnover should be considered, the record contains evidence that the facility employs a core of steady employees who will recall the experience of respondents' unlawful conduct. (ALJ Dec. at 152.) This experience will likely be shared with new employees as they join the payroll, and will likely taint the employees' outlook concerning any future elections.[12]

On balance, the Court concludes that there is sufficient record evidence concerning the pervasive and strict nature of respondents' unfair labor practices to provide reasonable cause to believe that the likelihood of assuring a fair rerun election is slight, and that imposition of a *Gissel* bargaining order is warranted in this case.

---

12. Whether Dunkin' Donuts cancellation of the Aldworth contract for Swedesboro, effective January 1, 2000 (see n. 3, *supra*) is a manifestation of this intended threat is not before the Court at this time, since that cancellation is not the subject of the pending unfair labor practices which this Court reviews upon the record under section 10(j) herein.

C. *Whether 10(j) Relief Is "Just and Proper"*

A section 10(j) injunction should be granted where the requested relief if just and proper. In order to find the requested relief just and proper, it must be in the public's interest to grant the injunction. *Eisenberg v. Lenape Products, Inc.,* 781 F.2d 999, 1004 (3d Cir.1986); *Hirsch v. Konig,* 895 F.Supp. at 697. This consideration is warranted because the public has an interest in "the integrity of the bargaining process." *Wellington Hall,* 651 F.2d at 907.

 In this case the public interest that is implicated is the safeguarding of the collective bargaining process. There is ample reason to conclude that through unlawful solicitation of grievances, threats, and disciplinary measures, respondents have effectively thwarted the objectives and goals of the NLRA.[13] Allowing the respondents' sustained anti-union campaign to suppress the employees' desire to unionize would chill further union activity and will damage the effectiveness of the protections against unfair labor practices built into the NLRA.

 Respondents present two arguments pertaining to the just and proper prong of the 10(j) analysis. First, they argue that the one-year lapse in time between the filing of the first charge by the union and the filing of the present petition in this Court shows that the Board is being disingenuous in requesting injunctive relief. "When reviewing the amount of time the Board takes to file a section 10(j) 'there is a certain amount of leniency that the Board must be afforded, stemming from the deference to the Board that is built into the statutory scheme.'" *Hirsch v. Konig,* 895 F.Supp. at 697 (quoting *Vibra Screw,* 904 F.2d at 881). The Board must engage in careful investigation and deliberation before it petitions the court for 10(j) relief. *Id.* In this case, there is no compelling reason to hold that the Board should have filed the present petition within a certain amount of time. The voluminous record in this case bespeaks the need for a detailed and time-consuming investigation into the facts and circumstances underlying the present claims. Indeed, Judge Kocol's opinion detailing his findings of fact and conclusions of law in this matter covers more than 150 singlespaced pages, and reflects the complex nature of the allegations before him. In short, the massive record in this case militates against barring 10(j) relief on the basis of passage of time.

This delay in filing is also more harmful to the employees than it is to the respondents, and if any party has a reason to take issue with the Board's delay it would be the members of the bargaining unit who were denied their right to a lawful election. The longer the delay in bargaining, the more harm they endure. *Id.*

Here, the Board's careful consideration of the record before filing for section 10(j) relief was warranted because of the complexity of the factual record, the length of

---

**13.** After the issuance of ALJ Kocol's decision in this matter, this Court by letter dated April 27, 2000 offered the parties the opportunity to comment on the decision as it pertained to the present 10(j) petition. In its May 10, 2000 response to this offer, respondent Aldworth attached an employee petition that purportedly demonstrates that a majority of the bargaining unit employees do not want the union to represent them. These documents, and any arguments premised upon them, are irrelevant and will not be considered by the Court for the purposes of 10(j) relief.

This proffer is improper for several reasons. First, the Court's letter to the parties invited them to comment on ALJ Kocol's decision, not to submit new evidence. Second, as this Court already has determined, the respondents' alleged violations of the Act and the union's support are assessed as of the time of the conduct, not after a year has passed. Third, this petition does not tend to counter the Board's assertion that respondents unlawfully undermined union support at the facility. For these reasons, the Court rejects Aldworth's untimely and non-probative May 10, 2000 proffer of an employee petition concerning union support.

the administrative hearings and the need to carefully brief the multiple and difficult legal issues in this case.[14]

Second, respondents argue that it would not be just and proper to enter a bargaining order, and that this Court should instead simply order that a new election be conducted. The Court disagrees. In this case, there is ample evidence, as found by ALJ Kocol, that the majority of employees in the bargaining unit selected representation by the union, as evidenced by the majority of membership cards and by the mere three-vote defeat of union recognition following respondents' unfair labor practices which tended to chill pro-union support. Declining to impose a mandatory bargaining order may lead to continued demoralization of the pro-union employees, as described in testimony at the hearing before this Court, and render it impossible to have a remedial election at a future date. The bargaining order is especially appropriate where the respondents took further steps, post-election, to commit unfair labor practices including termination of several of the principal union supporters. There is no fair way to reassemble the election "egg" that these unfair labor practices have so scrambled. In short, refusing to enter an interim bargaining order at this point would reduce the effectiveness of the full Board's decision should it enter a bargaining order. *See id.*

Granting reinstatement of discharged employees under 10(j) relief is also just and proper. Reinstatement will demonstrate that the reprisals against pro-union employees were unlawful and will send the message that anti-union discrimination will not be tolerated. Furthermore, reinstatement will allow unlawfully terminated employees to again become part of the bargaining process. The discharge of active and open union supporters undoubtedly had an adverse impact upon employee interest in unionization, and this impact must be countered swiftly and surely. *See Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d at 906–07.

Because the bargaining process will be protected by reinstatement of employees discharged pursuant to respondents' use of unfair labor practices, this Court concludes that reinstatement under 10(j) is just and proper. Respondents having discriminated against the discharged employees (including those terminated pursuant to the revised selection accuracy program),[15] they must offer them reinstatement. Those employees having been unlawfully transferred to different work assignments [16] must be restored to their previous positions and shifts. The respondents will, by the accompanying Order, each be required to submit an affidavit within ten (10) days hereof, certifying all steps taken to comply with this injunction.

## V. RESPONDENTS' JOINT LIABILITY

As previously discussed, the Court has determined that there is reasonable cause to believe that the respondents are joint employers within the meaning of the NLRA. Accordingly, the Order for injunctive relief shall apply equally to both Dunkin' Donuts and Aldworth, and both must comply with the terms of the Court's Order.

The Court rejects Dunkin' Donuts argument that it is not jointly liable for Aldworth's unlawful labor practices pursuant to the exception created in *Capitol EMI Music*, 311 NLRB 997, 1993 WL 195860 (1993), *enforced*, 23 F.3d 399, 1994 WL 198838 (4th Cir.1999), which provides that where one employer merely supplies em-

---

**14.** Moreover, much of the heft of the administrative record here is attributable to the respondents themselves, who have contested much and conceded little, as is their right, but thereby putting the NLRB to its proofs in the investigative and adjudicative phases.

**15.** These employees are: Leo, Moss, Nelson, Sellers, Mitchell, King, Allen, Bostic, Wolfer, Rosenburger, Everidge and Wallace.

**16.** These employees are: Moss, Sellers, King, and Mitchell.

ployees to another employer and otherwise takes no part in the daily direction of the workers, joint liability will not be automatically applied. As explained in Part II above, there is reasonable cause to believe that Dunkin' Donuts shared with Aldworth significant control over labor relations at the facility, and materially contributed to Aldworth's unlawful pattern of misconduct by committing its own unfair labor practices. In short, Dunkin' Donuts was not a passive bystander, and both respondents will be bound by the terms of this Court's Order.

## VI. CONCLUSION

For the reasons discussed herein, the Court finds reasonable cause to believe that respondents Aldworth Company, Inc. and Mid–Atlantic Distribution Center, Inc., are joint employers which have committed unfair labor practices under sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA, and that injunctive relief under section 10(j) of the NLRA is just and proper. This temporary injunctive relief includes recognition of the United Food and Commercial Workers Union Local 1360 as the collective bargaining representative of the designated unit, and a bargaining order, together with reinstatement of unlawfully discharged employees, and restoration to their previous positions of those employees who were unlawfully transferred within the facility in violation of the Act. Accordingly, the Board's petition for injunctive relief will be granted except to the extent that it seeks to show that respondents' adoption of the revised selection accuracy program violated section 8(a)(3) of the Act.[17] Each respondent shall submit an affidavit certifying all steps taken to comply with this injunction within ten (10) business days hereof. The accompanying Order is entered.

17. As explained above in Part IV.B.3.b, the revised selection accuracy program nonetheless violates section 8(a)(5), so this is largely a distinction without a difference. All employ-

## ORDER

THIS MATTER having come before the Court upon the petition of Dorothy L. Moore Duncan, Regional Director of the National Labor Relations Board ("Board") for injunctive relief pursuant to section 10(j) of the National Labor Relations Act ("Act"), as amended, 29 U.S.C. § 160(j) as against respondents Aldworth Company, Inc., and Dunkin' Donuts Mid–Atlantic Distribution Center, Inc.; and the Court having considered the parties' submissions and the decision in this matter of Administrative Law Judge William Kocol; and having heard testimony and oral argument on this matter and having received supplemental submissions; and for the reasons discussed in the accompanying Opinion;

**IT IS** this 20th day of December, 2000 hereby

**ORDERED, ADJUDGED AND DECREED** that pending the final disposition of the matters involved herein pending before the full Board, respondents, Aldworth Company, Inc. and Dunkin' Donuts Mid Atlantic Distribution Center, Inc., their officers, representatives, agents, servants, employees, attorneys, successors, assigns, and all persons acting in concert with them (hereinafter referred to as "the Respondents") shall be, and hereby are, enjoined and restrained from:

1. Refusing to recognize or bargain with the United Food and Commercial Workers Union Local 1360 affiliated with the United Food and Commercial Workers International Union, AFLCIO ("the Union") as the exclusive collective bargaining representative of employees in the following bargaining unit ("the Unit"):

 All full-time and regular part-time drivers, warehouse employees, yard jockeys, maintenance employees and warehouse trainees employed by respondents at the center, excluding all

ees terminated pursuant to the revised policy will be reinstated pending final resolution of this matter by the full Board.

other employees, guards and supervisors as defined in the Act;

2. Threatening employees with loss of employment if they seek union representation;

3. Threatening employees with loss of benefits if they seek union representation;

4. Soliciting employee complaints and grievances in order to discourage employees from seeking union representation;

5. Promising the betterment of benefits in order to discourage employees from seeking union representation;

6. Soliciting employees to report being bothered or harassed by union activity;

7. Disparaging employees because of their union support;

8. Threatening to discipline or discharge employees if they support the union;

9. Threatening that it would be futile for employees to select the union as their collective bargaining representative;

10. Promising to create and creating new positions and inviting employees to bid on the newly created positions in an effort to undermine union support;

11. Promising employees that they would no longer have to deal with an unpopular supervisor in an effort to undermine union support;

12. Instructing employees to remove their union T-shirts and pins and/or threatening to discharge employees for wearing union pins;

13. Threatening plant closure and/or threatening to impose less favorable working conditions if employees selected the union;

14. Engaging in unlawful surveillance of union activities;

15. Discharging, suspending, or otherwise disciplining employees because they support the union or engage in other protected activity;

16. Unilaterally instituting new terms and conditions of employment including the Selection Accuracy Program;

17. In any other manner interfering with, restraining or coercing the Respondents' employees asserting their rights under section 7 of the Act; and

**IT IS FURTHER ORDERED, AD-JUDGED AND DECREED** that, pending the final disposition of the matters involved herein pending before the full Board, the Respondents, their officers, representatives, agents, servants, employees, attorneys, successors and assigns and all persons acting in concert or participation with them, shall take the following affirmative action:

1. On an interim basis, offer Robert Moss, Kenneth Mitchell. Jesse Sellers and Douglas King reinstatement to the positions and shifts they held prior to October 13, 1998. without prejudice to their seniority or any other rights and privileges previously enjoyed;

2. On an interim basis offer Leo Leo, Robert Moss, and all employees discharged pursuant to the new Selection Accuracy Program (namely (1) Allen, (2) Bostic, (3) Sellers, (4) Mitchell, (5) Wolfer, (6) Rosenburger, (7) Nelson, (8) Everidge and (9) Wallace), reinstatement to their former positions, or, if those positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights and privileges previously enjoyed;

3. On an interim basis, recognize, and upon request, bargain in good faith with the Union as the exclusive bargaining representative of the Unit;

4. On an interim basis, rescind the new Selection Accuracy Program first implemented in early October 1998;

5. Immediately post copies of this Court's Order in this case in respondents' Swedesboro, New Jersey facility in locations where other notices to employees are customarily posted; maintain these postings during the Board's administrative process free of all obstructions and

defacements, and grant to agents of the Board reasonable access to these facilities in order to monitor compliance with the posting requirement;

6. Within ten (10) days of the issuance of this Court's Order (excluding weekends and holidays, that is, by January 5, 2001) file with this Court, and serve a copy upon petitioner, a sworn affidavit from a responsible official of each of the respondents, setting forth with specificity the manner in which respondents have complied with this Court's Order including the locations where the required postings have been made; and

**IT IS FURTHER ORDERED** that this Order shall expire six months from the date of issue; provided however, that petitioner may move the Court for a thirty day extension of this Order if it then appears that the National Labor Relation Board's final decision in this matter is then imminent.